[S. F. No. 15347. In Bank.—April 30, 1936.]

THE ATKINS CORPORATION (a Corporation), Respondent, v. GEORGE TOURNY et al., Trustees, Appellants; OLGA WAIZMAN, an Incompetent Person, etc., Intervener and Appellant.

Hugh Goodfellow, *in pro. per.*, Carl Westerfeld, Thomas Ashby and A. Dal Thomson for Appellants.

Edgar C. Levey for Respondent.

THOMPSON, J.—The plaintiff commenced this action against the trustees of a voting trust of shares of the capital stock of the San Francisco Bank to compel the restoration of lost trust certificates of which plaintiff, as assignee, claims ownership and the execution by the trustees of certificates in place of those lost, and the transfer to plaintiff by the trustees of all the right, title and interest of the intervener, Olga Waizman, who was originally named a party defendant. On September 12, 1930, Olga Waizman had been induced by one Simons to exchange two trust certificates representing two shares of stock in the bank mentioned, and of the value of over $25,000, for 3,000 shares of stock in the Security Petroleum and Royalty Corp., Ltd. When she sought the certificates for the purpose of making the assignment they could not be found. This action was commenced. When Miss Waizman was served with process, she telephoned Simons, who took her to his counsel, who explained the action to her and then sent her to an attorney whom he recommended. This attorney, after talking with Miss Waizman and with plaintiff's attorney, filed a disclaimer of Miss Waizman's interest, on November 24, 1931. The complaint had been filed November 8th. On December 1, 1931, Miss Waizman was adjudged incompetent by an order of the superior court and Frank Waizman was appointed guardian of her estate and person. The latter, on December 14th, served notice of rescission of the agreement of exchange and offered to restore the oil stock, and also very shortly thereafter (December 22d) filed a notice of a motion to vacate, set aside and strike out the disclaimer and permit him to file, on behalf of his ward, an answer and cross-complaint. Before the motion could be heard, plaintiff dismissed as against Olga Waizman. The guardian by this maneuver, was compelled to take another course, which he did by securing an order to file a complaint in intervention, in which it was alleged that the purported exchange agreement was null and void because of the incapacity of Olga Waizman, the inadequacy of the consideration, and because of the fraudulent representations prac-

ticed upon her. The plaintiff answered, denying inadequacy of consideration, incompetency and fraud. The trustees answered the complaint and admitted the issuance of the trust certificates but, for want of information and belief on the subject, denied the assignment alleged in the complaint. The answer of the trustees to the complaint in intervention admitted the incompetency of Olga Waizman, the inadequacy of the consideration and fraud. For lack of information and belief, the trustees denied loss of the certificates or that they had not been sold, assigned, pledged or otherwise hypothecated. Judgment was rendered for the plaintiff to the effect that the trustees execute, issue and deliver two voting trust certificates in the place of those issued to the intervener, and in her name, and ordering Miss Waizman or her guardian to endorse and assign these certificates to plaintiff. It also adjudged that the intervener had no right in the certificates and that the agreement of exchange was valid and binding. From this judgment there are two appeals, the one by Olga Waizman, an incompetent, and the other by the trustees.

For purposes of convenience, we will consider first the appeal of the intervener.

The court found against the intervener on all the issues. It is the contention of her guardian that the evidence is insufficient to justify the findings, and further, that the court erred in excluding evidence of other frauds committed by plaintiff, and erred also in permitting the witness Simons to testify concerning the soundness of mind of the appellant Waizman.

We shall treat the contentions in their reverse order. Was the witness Simons competent, under section 1870, subdivision 10, of the Code of Civil Procedure, to give his opinion concerning the sanity of the appellant? Was he an "intimate acquaintance" within the meaning of that section? It was Simons who negotiated with Miss Waizman for the exchange of stock. He secured her name from a "stock list" and called upon her for the first time on or about September 5, 1930, for from thirty to forty-five minutes. He saw her again a day or two later and, in order that he might talk his business with her, took her for a ride covering a period of "an hour and a half or two hours". On the following day, he again took her for an automobile ride and talked business with her. A day or two later he saw her for the

fourth time and they went to a bank, where some man asked Simons a few questions. He could not remember who the man was or what position he was supposed to have with the bank. Miss Waizman told him on this occasion that she thought she would "make the deal". On the day following Simons called upon her, drove with her just around the corner and secured Miss Waizman's signature. Hence, according to his own testimony, he had seen Miss Waizman five times before the agreement was signed, each time earnestly engaged in endeavoring to make an exchange of stocks. We are not unmindful of the rule that the question of whether one is an intimate acquaintance within the meaning of section 1870, subdivision 10, of the Code of Civil Procedure, rests largely in the discretion of the trial judge and his ruling will not be disturbed in the absence of an abuse of discretion. But the legislature must have intended, when it authorized laymen to give their conclusions as to mental condition, and then qualified this permission by providing that only "intimate" acquaintances should so testify, that the class who might thus testify should be considerably limited. In a rather early case, that of *Estate of Carpenter*, 94 Cal. 406 [29 Pac. (2d) 1101], this court attempted to define what is meant by the term "intimate", and also to show that in this state we have endeavored, so far as this precise question is concerned, to travel the middle road between two widely divergent views. We there read, at page 414:

"What is an intimate acquaintance has not been very clearly settled. The requirement that such an acquaintance shall be intimate acquaintance does not seem to exist elsewhere. In *State* v. *Pike*, 49 N. H. 399 [6 Am. Rep. 533], Mr. Justice Doe, in a dissenting opinion, which has since been followed in that state, considers the question as to whether persons not experts can be allowed to testify in regard to mental sanity. He seems to assert that in England the rule has always been to receive such testimony, and he shows by numerous citations that such, too, has been the rule in most of the states. The witnesses are only required to have had sufficient opportunity to observe the person whose sanity is in question. Different rulings have been made as to what shall be considered a sufficient showing of opportunity of observation to enable a witness to form an opinion which can be received as evidence; or, expressed in the

language of our code, what degree of intimacy there must be. In general, the idea seems to be, that no rule can be prescribed on this subject, and therefore, as in regard to handwriting, if it appear that there has been some opportunity, and the witness has an opinion, he may state it. The value of it will depend upon circumstances. In some states such evidence is not received at all from non-experts. Our code provides that intimate acquaintances may give their opinions, and, of course, the converse will follow that no others can. The phrase 'intimate acquaintance' cannot include all acquaintances. Worcester, under the word 'acquaintance', has the following: 'Acquaintance expresses less than familiarity; familiarity less than intimacy. Acquaintance springs from occasional intercourse; familiarity from daily intercourse; intimacy from unreserved intercourse. Acquaintance, having some knowledge; familiarity, from long habit; intimacy, by close connection.'

"In *People* v. *Levy,* 71 Cal. 618 [12 Pac. 791], it is said: 'It is often a difficult question to determine whether the witness is sufficiently acquainted with the party to entitle him to speak. That the witness should be familiar with the temperament and habits of mind of the person whose soundness is in question there is no doubt.' Sir John Nicholl, in *Kinleside* v. *Harrison,* 2 Phill. Ecc. 449, says: 'Persons who see a testator only occasionally will form different opinions from those who have better opportunities of judging; we know that little appearances occurring in this way are extremely fallacious, yet we often find occasional observers depose with great confidence. -It often happens that the most ignorant are the most confident. . . . This kind of opinion is still more various where the testator's capacity is fluctuating, where he is sometimes better and sometimes worse, and this is generally the case with old age or other infirmities.'

"An intimate acquaintance would appreciate these varying moods and temperaments, and be able to judge the acts of a testator with full knowledge of his peculiarities. A mere acquaintance who only casually meets one who has some infirmities, and, perhaps, also some striking idiosyncrasies, although quite often, and yet without special interest in him, might think strangely of conduct which to one better acquainted would seem rational and natural. No two persons are exactly alike, and many, in fact nearly every one, has some weakness which, perhaps like physical infirmities, they

endeavor to favor or hide. Our thoughts run in different channels; our mental processes follow different methods. An intimate acquaintance who is familiar with all these can better judge of mental conditions.

"Now, when we take into consideration the rule as it exists in most jurisdictions where the common law prevails, we must conclude that our code has attempted, what has been said to be impracticable, to establish a rule as to what opportunities of observation shall entitle a witness to speak. A non-expert may testify, but only if he has had these advantages which I have attempted briefly to specify, notwithstanding the statutory attempt. Since it requires the drawing of a definite line between things which are separated only by degrees of difference, the rule is and must remain more or less indefinite. A very large discretion must be conceded to the trial court. If the conclusion reached is one which can be reasonably entertained, consistently with the above idea of intimacy, this court cannot review the ruling.

"Some of the witnesses who were allowed to give their opinions as to the sanity of the deceased evidently were not intimate acquaintances within this rule; and the objection is not avoided by varying the form of the question,—asking the witness how he appeared mentally. If anything, this adds to the objection, for it fails to require the witness to give the reason for his belief."

Other cases could also be referred to. (See *Estate of Loveland,* 162 Cal. 595 [123 Pac. 801]; *Huyck* v. *Rennie,* 151 Cal. 411 [90 Pac. 929].) It is true that all of the cases recognize that the determination of who is an "intimate" acquaintance, within the meaning of the section, rests largely in the discretion of the trial court. (See *Wheelock* v. *Godfrey,* 100 Cal. 578 [35 Pac. 317]; *Estate of Lenci,* 106 Cal. App. 171 [288 Pac. 841].) But, necessarily, if there has been an abuse of discretion, it may be corrected on appeal. In *State* v. *Leakey,* 44 Mont. 354 [120 Pac. 234], the Montana Supreme Court, in reversing a trial court, had the following to say on this question (p. 238):

"The court also erred in permitting the witness George Albert to express an opinion that the defendant was sane. According to his own statement, he had known the defendant but a short time and had formed only a casual acquaintance with him and had limited opportunity to observe his conduct.

The acquaintance had covered about three weeks while the two were employed at a cattle roundup near Wibaux. He met the defendant only at meals and never had a conversation with him in person. It was said in *State* v. *Penna,* 35 Mont. 535 [90 Pac. 787], that the determination of the question what an intimate acquaintance is, within the meaning of the statute, must be left to the trial court, and that its conclusion will not be reviewed except in case of a clear abuse of discretion. ·Nevertheless its discretion must in all cases be used in a reasonable way. It must be called into exercise by the facts presented in each case. The acquaintance must be more than casual. The term 'intimate' means 'close in friendship or acquaintance; familiar; confidential'; also: 'near; close; direct; thorough; complete.' Webster's International Dictionary. A moment's consideration leads to the conclusion that it was the purpose of the legislature in enacting the statute, to settle the rule by restricting the class of laymen who may be permitted to state an opinion, to those who are or have been so closely related in their associations with the person the soundness of whose mind is in question, that they have become familiar with his temperament or habits of mind. Otherwise a mere passing acquaintance would be held a qualified witness."

 The importance of Simon's testimony is made apparent when the facts of the case are considered. Intervener presented many witnesses—relatives and friends of many years standing—all of whom testified that on September 12, 1930, Miss Waizman was of unsound mind. All these witnesses gave logical and convincing reasons for their conclusions. Undoubtedly the intervener established a strong *prima facie* case on the incompetency issue. The only testimony produced by plaintiff to rebut this *prima . facie* case was that of Simons, the alleged perpetrator of the fraud, his wife, and the attorney who filed the disclaimer above mentioned and who was secured for Miss Waizman by Simons. Mrs. Simons testified that she first met Miss Waizman September 17, 1930, five days after the perpetration of the alleged fraud. Thereafter, and prior to trial, she had met her a few times on "social" visits. In her opinion, on these occasions, Miss Waizman's conversation "was very rational". The attorney who filed the disclaimer first met Miss Waizman almost a year after the 12th of September, 1930, and

then saw her on but two occasions. He testified that when he met Miss Waizman her conduct, conversation and appearance were rational. Neither of these witnesses knew Miss Waizman on the date the transaction was consummated and so, of course, knew nothing of her mental condition on that date. Simons, over strenuous objection, was permitted to qualify as an intimate acquaintance and to testify that, in his opinion, on September 12, 1930, Miss Waizman was sane. As already stated, he had met Miss Waizman, prior to that date, on five occasions, on each of which he discussed business. In that period he induced her to agree to exchange her valuable bank stock, worth in excess of $25,000, for some speculative oil stock. Simons knew at that time that Miss Waizman was entirely dependent on the dividends from that stock for her living. Simons was the only witness who testified that on September 12, 1930, Miss Waizman was sane.

We are not unmindful of the rule that a presumption of sanity exists and that the trial court had the opportunity of observing both Simons and Miss Waizman. We are not holding that the finding as to sanity is totally unsupported. We do feel, however, that to permit Simons to testify on this issue, under the circumstances here disclosed, was an abuse of discretion. ■ Whether this error, standing alone, would require a reversal, we do not find it necessary here to decide, for the reason that we are of the opinion that the trial court refused to admit certain testimony that should have been admitted, which refusal seriously prejudiced intervener's case. It was the theory of intervener that the exchange here complained of was consummated at a time Miss Waizman was incompetent or, if competent, that the transaction was induced by reason of the fraud of Simons. In view of the retrial, we do not deem it proper completely to review the evidence on this fraud issue. A reading of the record convinces us that intervener produced evidence which, if believed, would have sustained a finding that the exchange was induced by reason of certain fraudulent misrepresentations on the part of Simons and upon which Miss Waizman relied. It must be remembered that at the time of the trial Miss Waizman had been judicially declared incompetent. Although called as a witness, she could remember none of the details of the transaction. She was obviously incoherent and suffering from a loss of memory. Under such circum-

stances, intervener was compelled to prove the fraud by cross-examination of Simons, the alleged perpetrator of the fraud, and obviously an adverse and hostile witness. Simons admitted that he represented to Miss Waizman that the lands of the corporation whose stock he exchanged for the bank stock were in a "proven field" and that the Shell Oil Company well, on lands adjoining the corporation's lands, was a "producing well". Reading Simon's testimony as a whole, we think that it is susceptible of the interpretation that by these representations he intended to convey to Miss Waizman, and did in fact convey to her, the impression that the Shell Oil Company well was then producing oil in paying quantities and that this proved that the adjoining land would likewise produce oil in paying quantities. As a matter of fact, the log of the Shell well shows that the well had been "killed with mud on September 11, 1930 [the day before the exchange was consummated] preparatory to deepening well". The well was not then producing, nor had it ever produced oil in paying quantities, and was subsequently abandoned. The evidence, so interpreted, clearly would sustain a finding of fraud. (*Pohl* v. *Mills*, 218 Cal. 641 [24 Pac. (2d) 476]; *Spreckels* v. *Gorrill*, 152 Cal. 383 [92 Pac. 1011]; *Tracy* v. *Smith*, 175 Cal. 161 [165 Pac. 535]; *DeGarmo* v. *Petitfils Confiserie*, 93 Cal. App. 261 [269 Pac. 692].) Under such circumstances, to strengthen his case, intervener offered evidence of similar transactions of Simons at or about the same time, dealing with the same oil stock. This the trial court excluded on the theory that intervener had failed to prove any fraud. The evidence should have been admitted. ▮ Cases of fraud are exceptions to the general rule that other offenses of the accused are not relevant to establish the main charge. Where fraud is charged, evidence of other frauds or fraudulent representations of like character, committed by the same parties at or near the same time is admissible to prove intent. (*Evans* v. *Gibson*, 220 Cal. 476 [31 Pac. (2d) 389]; *Kornblum* v. *Arthurs*, 154 Cal. 246 [97 Pac. 420]; 12 Cal. Jur. 831.)

Under the circumstances of this case, the error in excluding this evidence was serious and prejudicial. As already stated, the intervener was forced to prove his case on the fraud issue, his ward being incompetent, largely from the testimony of a highly interested and adverse witness. Under such circumstances, it was error of a most serious nature to

have excluded evidence of other similar transactions of Simons at or about the same time.

In view of the retrial of this case, some mention should be made of the legal issues presented by the appeal of the defendant trustees. The decree ordered that the trustees execute and deliver to the plaintiff the voting trust certificates in the form set forth in the judgment and identical with the certificates lost by Miss Waizman. It is also provided that an indemnity bond in the sum of $30,000 shall be furnished by the plaintiff to the defendant trustees, indemnifying against loss or liability which may be suffered by reason of the execution of these new certificates.

It is the main contention of the trustees that the trial court had no authority to order the physical re-execution of the certificates; that the action was merely the old common-law action of restoration and that the decree should have been limited to an adjudication that these certificates had been issued to Miss Waizman, and to a judicial declaration of the contents of the certificates.

The position of the trustees is untenable. It should first be mentioned that these trustees are correct in their contention that this is not an action against a corporation and that shares of stock do not constitute the subject of the action. It, therefore, follows that the provisions of section 330.18 of the Civil Code, providing for exactly the remedy here decreed by the court, have no application to this case. Whatever power the equity court had to render the decree here complained of must be found in the general powers of equity courts and not in the statutory law.

We are of the opinion that in a proper case the equity court, where a document has been lost, may require the physical re-execution of the document on such terms and conditions as may be fair to both parties. In many cases, the owner of the lost document will be fully protected, by a simple judicial decree declaring the contents of the lost document. In such a case, the equity court will not grant relief beyond that necessary. But in many cases, of which the present case is a good example, in order that the owner of the lost document may fully enjoy the benefits of ownership, it is necessary that the document be physically restored. In such a case, an equity court possesses full power physically to restore the document. That such power exists is evidenced

by the case of *Brown* v. *Anderson-Cottonwood Irr. Dist.*, 183 Cal. 186 [190 Pac. 797], where a bond was ordered to be physically restored. There are many other cases illustrating the exercise of a like power. Thus, in *Cummings* v. *Coe*, 10 Cal. 529, a deed was ordered physically restored. (See, also, *Conlin* v. *Ryan*, 47 Cal. 71; *Kent* v. *Church of St. Michael*, 136 N. Y. 10 [32 N. E. 704, 32 Am. St. Rep. 693, 18 L. R. A. 331]; *Cade* v. *Walker*, 214 Ala. 675 [108 So. 594].)

The cases cited by the trustees to the effect that in those particular cases the relief granted was limited to a judicial declaration of the contents of the document are not necessarily *contra*. All that was there held was that, under the facts there presented, the owner of the document would be fully protected by such a decree. Such is not the situation in the present case, where, if the owner of the voting certificates is to enjoy all the benefits of ownership, he must possess the documents. We find nothing contrary to the views herein expressed in *McKeon* v. *Neuschwander*, 209 Cal. 283 [286 Pac. 1010].

In view of the retrial, we do not deem it proper to discuss the sufficiency of the evidence offered to prove that the certificates were lost. Of course, such proof is required as a condition precedent to the exercise of the power.

The judgment against intervener and against the defendants is reversed.

Waste, C. J., Conrey, J., Shenk, J., Langdon, J., Seawell, J., and Curtis, J., concurred.

Rehearing denied.