[Civ. No. 13966. Fourth Dist., Div. Two. Aug. 6, 1975.]

WILLIAM W. CRAIN et al., Plaintiffs and Appellants, v. ELECTRONIC MEMORIES AND MAGNETICS CORPORATION et al., Defendants and Respondents

## COUNSEL

James C. Peterson for Plaintiffs and Appellants.

Eilers, Stewart, Pangman & Miller, Richard K. Quinn, Rutan & Tucker, John B. Hurlbut, Jr., C. Richard Lemon, Crosby & Luesebrink and Richard W. Luesebrink for Defendants and Respondents.

## OPINION

**KERRIGAN, J.**—Plaintiffs (a class of founding shareholders represented by William W. Crain) appeal from a judgment on the pleadings entered in favor of defendants. The judgment—which resulted in the dismissal of

plaintiffs' complaint with prejudice—was based upon the trial court's determination that it did not set forth personal causes of action which could be prosecuted by plaintiffs in their individual capacities, but rather advanced derivative causes which could be brought only on behalf of the corporation in which plaintiffs are shareholders.

## FACTS

Preliminary to our discussion of this case, we should properly set forth applicable rules regarding the scope of our reviewing authority involving an appeal from a judgment on the pleadings.

■ A defendant may move for judgment on the pleadings, prior to or during trial, on the same grounds that could be advanced to support a general demurrer: failure of the complaint to state a legally cognizable cause of action. (*Colberg, Inc.* v. *State of California* ex rel. *Dept. Pub. Wks.*, 67 Cal.2d 408, 412 [62 Cal.Rptr. 401, 432 P.2d 3]; *Kachig* v. *Boothe*, 22 Cal.App.3d 626, 630 [99 Cal.Rptr. 393]; 4 Witkin, Cal. Procedure (2d ed. 1971) § 161, p. 2816.) Such a motion reaches only the contents of the pleading and such matters as may be considered upon judicial notice (*Weil* v. *Barthel*, 45 Cal.2d 835, 837 [291 P.2d 30]): the trial court must accept plaintiff's allegations of fact as true when ruling on the motion (e.g., the motion admits all material, well-pleaded facts, and all fair inferences drawn therefrom). (*Flores* v. *Arroyo*, 56 Cal.2d 492, 497 [15 Cal.Rptr. 87, 364 P.2d 263]; *Souza* v. *Market Street Ry. Co.*, 106 Cal.App. 347, 351 [289 P. 665].)

Because of the aforestated rules, the appellate court must assume an unusual posture in reviewing judgments entered on the pleadings. ■ While it is the duty of a reviewing court, in most cases, to indulge in every reasonable presumption in favor of sustaining the trial court, substantially the reverse is true when plaintiff appeals from a judgment on the pleadings. (See *Seeger* v. *Odell*, 18 Cal.2d 409, 412 [115 P.2d 977].) Hence, the statement of facts which follows was drawn exclusively from the allegations contained in plaintiffs' complaint, and said statement must serve as the framework for our review of the judgment.

Between 1965 and 1968 the plaintiffs (a group of computer engineers, programmers, and data processing specialists), with the assistance of several independent computer operations consultants, expended $40,000 in the design and development of a prototype for the "Documentor

Computer System." This system consists, primarily, of a compact electronic. computer and memory system, which is designed to perform comprehensive data processing functions (including tabulation of sales, inventory, and payroll accounting data) for fast-food restaurants. On July 25, 1968, plaintiffs incorporated the Documentor Sciences Corporation (DSC) for the purpose of developing, manufacturing and marketing this data-processing system. The plaintiffs (investors and founding shareholders) assigned all patent rights[1] in the computer system (as well as an operating prototype) to the corporation in exchange for shares of common stock. Originally, 28,350 shares, with a par value of $5 per share, were issued. to the founders. But a five-for-one stock split in October 1970 increased plaintiffs' holdings to 141,750 shares and reduced the par value to $1 per share. This original issue of DSC stock was approved September 12, 1968, by the Commissioner of Corporations, but certain restrictions were placed upon the aforementioned ("promotional") shares issued to plaintiffs-inventors (pursuant to then Cal. Admin. Code, tit. 10, § 368 et seq. [now § 260.140.30 et seq.]): (1) The written consent of the commissioner was required before ownership of these promotional shares could be transferred; (2) until declared otherwise by the commissioner, promotional shares were not permitted to participate in any cash, stock, or property dividends paid by the corporation; (3) and the holders of said shares were not permitted to participate in any distribution of assets made by the corporation, until such condition was rescinded by the commissioner.[2] Further, voting rights of plaintiffs, promotional shares were suspended after September 1971 (subject to modification by the commissioner). The authorizing permit stipulated that no amendment of the aforesaid conditions would be had until the corporation demonstrated it was in "sound financial condition," (e.g., not until DSC's aggregate, average annual earnings, over three successive years, amounted to not less than 15 percent on average invested capital).

During the course of the next year it became obvious to the founding shareholders that DSC would require substantial amounts of new capital in order to meet payroll and operating expenses, as well as to finance plant and equipment investment, design, field testing, and marketing programs.

---

[1] *At least six new patents resulted from the inventors' work.*

[2] In 1968 the relevant portion of California Administrative Code, title 10, section 372 [now § 260.141] read as follows: "Promotional shares . . . shall carry a waiver of dividend rights . . . and rights to participate in the distribution of assets in the event of liquidation or dissolution, in favor of the shareholders who have paid cash or its equivalent for their shares."

In order to obtain sufficient financing, DSC entered into a written agreement[3] with Electronic Memories and Magnetics Corporation (EMM) on November 7, 1969. The agreement contained the following provisions: EMM agreed to advance sufficient capital to DSC to sustain it during its formative period; in exchange for these funds, EMM was to receive a series of secured convertible promissory notes (which EMM was free to transfer or assign, or which could be exchanged for authorized but unissued shares of DSC common stock at an agreed conversion rate); EMM obtained an option to exchange shares of its (EMM) stock for all outstanding shares of DSC common stock (including plaintiffs' shares), based upon an agreed formula; and EMM was given the authority (via irrevocable voting proxies) to appoint two of DSC's five directors (and after Mar. 31, 1971, three of the five).

This financing arrangement was approved by DSC's founding shareholders at two meetings in late 1970. And on December 8, 1970, EMM had defendants Rosenberg and Taylor named to the DSC board of directors.

Also during 1970 EMM succeeded in securing the removal of DSC's chief executive officer (N. Robert Crain) and had him replaced with defendant Zechter, by threatening to discontinue its financing of the DSC venture. Zechter then succeeded to the DSC board of directors, and by year's end EMM representatives occupied a majority of the directors' chairs (three of five).

Between November 1969 and December 31, 1971, EMM advanced $3.5 million to DSC. These funds were invested, in part, in capital investment, development, and field testing of the Documentor accounting system. Defendant Zechter, as president of DSC, mailed the corporation's shareholders glowing financial reports during 1970 and 1971, predicting a bright future for the computer company. Zechter's last report to the shareholders was dated February 28, 1972. It read, in part, as follows: DSC sales figures had risen from $31,000 in 1970 to $519,000 in 1971 ($236,000 during the last quarter of 1971); research, development, and production costs had been "stable" for the past year; the Documentor system's reliability had been improved, and its unit cost reduced; new orders had been received from Gino's and MacDonald's fast-food chains; DSC customers were reportedly satisfied with the company's product; new distributorship agreements had been signed in

---

[3]The initial agreement was in letter form; however, it was formalized by a series of writings denominated the "DSC-EMM financing agreements" in November 1970.

1971 with Moore Business Forms (which had initially placed a $270,000 order for 50 units) and Dataprep; MacDonald's had satisfactorily completed on-site testing of the Documentor system in 1971, and large orders were expected; and, finally, DSC's need for outside capital financing was expected to be a reduced rate for 1972. In sum, the report indicated that the Documentor system had a bright and profitable future at hand.

Although EMM had provided substantial capital to DSC during 1970-1971, EMM had suffered serious financial losses. In 1970, EMM showed operating losses of $14 million. In 1971, operating losses amounted to $8.5 million (on sales of $75 million), and investment losses (other than DSC) mounted to $7 million. As a result of these losses EMM's line of bank credit was reduced from $20 million to $9 million and, eventually (in September 1972) to $7 million. EMM's publicly traded common stock fell from $40.12 to $6.37 (per share) in 1970, and as a result the New York Stock Exchange suspended all credit purchases of EMM shares in May 1971.

Plaintiffs suggest that these financial reversals presented EMM with a serious cash-flow problem, and a search for liquid assets within the corporation was begun. At this same time defendants Rosenberg, Taylor, and Zechter (all intimately tied to the management of EMM), as directors of DSC, initiated a search for a purchaser of DSC assets.[4]

On May 26, 1972, Zechter, as president of DSC and on behalf of the corporation, executed a purchase and sale agreement with defendant Addressograph Multigraph Corporation (AM) for the sale of the "entire business and assets" of DSC. Said agreement was ratified the same day by a majority of DSC's board of directors. (Three of the board's five directors approved the sale: defendants Rosenberg and Zechter, and Robert Crain.) By the terms of the agreement DSC was required to call a special meeting of its shareholders no later than June 15, 1972 to ratify the sale; and EMM agreed that it would exchange a sufficient number of its convertible notes to secure a majority (51 percent) of the outstanding shares of DSC prior to the June 15 meeting. Sometime between May 26 and June 15 EMM exchanged enough promissory notes to secure 1,302,458 shares of DSC stock—which represented 80 percent of the outstanding shares.

---

[4]As of December 31, 1971, EMM had advanced $3.5 million to DSC in exchange for convertible, secured promissory notes (due in 1975). These notes, if converted, represented an 80 percent equity interest in DSC.

The DSC directors mailed notice of the June 15 meeting to the corporation's shareholders on June 6. (This was the first notice of the proposed sale that plaintiffs, as minority shareholders, received.) At the June 15 meeting EMM voted its majority shareholder interest to ratify the proposed sale of assets, over the objection of a number of minority stockholders. EMM also used its majority control to effect the following changes in DSC's corporate organization: the name of the corporation was changed to 12621 Chadron Ave., Inc.;[5] the number of directors was reduced from five to three; and defendants Rosenberg, Taylor, and Sprigle (all currently directors and/or principal executive officers of EMM) were elected to the three board positions.

Pursuant to the purchase agreement AM was required to make an immediate cash payment of $981,200 to DSC (a total deferred payment of $1,056,200 was eventually to be paid); assume direct responsibility to repay EMM $453,103.94—which represented the sum still owed to EMM on its unconverted promissory notes; assume all current liabilities and obligations of DSC; and pay EMM the sum of $20,000 for a covenant not to compete for three years. On June 15, immediately following shareholder approval of the sale, Zechter met with AM representatives to formally transfer the business and assets. Rosenberg, Taylor and Sprigle were also present and accepted the $981,200 cash payment on behalf of the corporation. Immediately upon receipt of this sum these three defendants loaned the entire amount to EMM, and took in return an unsecured promissory note payable to DSC. At the conclusion of the transfer Zechter received a long term employment contract (with a 60 percent increase in salary) to continue as chief executive officer of AM's new "documentor accounting systems" operation.

Subsequent to the formal transfer of assets, EMM made a private, restricted purchase offer to all DSC minority shareholders, other than the plaintiffs. As a result of this offer EMM was able to purchase all outstanding DSC shares, save for plaintiffs', for cash. Since June 15, 1972, DSC has existed as nothing more than a "shell" corporation, wholly inactive, whose only asset is an unsecured promissory note for some $981,200. DSC's three directors have announced that plaintiffs' shares, because of their promotional status, will henceforth be considered worthless by the corporation; and plaintiffs will be excluded from any and all future corporate distributions.

---

[5] To avoid confusion, the corporation will continue to be referred to as DSC.

Informed of the directors' posture toward their shares, plaintiffs filed this lawsuit on March 22, 1973. The complaint, which numbers nine causes of action, is a class action brought by William W. Crain (mechanical designer, founder and original shareholder of DSC), who represents a class of founding DSC shareholders similarly situated (e.g., still in possession of the corporation's original promotional shares). Named as defendants are EMM (majority shareholder in DSC at the time of its asset sale to AM); Milton Rosenberg and Trude Taylor (former directors of DSC and directors and executive officers of EMM); Sol Zechter (former director and chief executive of DSC); Richard Sprigle (director and executive officer of both 12621 Chadron Ave., Inc. and EMM); Addressograph Multigraph Corporation (purchaser of the business and assets of DSC); and 12621 Chadron Ave., Inc. (the successor in interest to DSC, and named as a nominal defendant).

The plaintiffs' first cause of action names EMM, Rosenberg, Taylor and Zechter as defendants, and charges that each engaged in self-dealing transactions and otherwise breached fiduciary duties owed to plaintiffs as minority shareholders. Plaintiffs allege that EMM, as a majority shareholder acting through the aforenamed defendant-directors, conspired to dispose of DSC assets in such a way so as to insure that EMM received the largest possible financial benefit, without regard to the financial consequences visited upon the minority shareholders. The second cause of action names the same defendants aforementioned, and alleges that they engaged in constructive fraud and breached fiduciary duties by encouraging defendant Zechter to author deceptive and misleading shareholder reports, which concealed material information regarding DSC's financial condition, financing arrangements, and prospective sale of assets. Plaintiffs allege that Zechter's glowing stockholder reports of 1970 and 1971 were written at the behest of EMM, with the aid of the other defendants, and were overly optimistic—especially in light of EMM's precarious financial situation.

The third and fourth causes of action name EMM as the only defendant and are based upon alleged breaches of contract. In the third cause of action, plaintiffs assert that the DSC-EMM financing agreement of November 1970 included a provision which covenanted that, if EMM should convert a sufficient number of its promissory notes to become DSC's majority shareholder (on or before Dec. 28, 1974) it (EMM) would continue to advance necessary financing funds to DSC, and to

operate that corporation for the benefit of *all* shareholders.[6] Plaintiffs claim that this agreement constituted a third party beneficiary contract, negotiated and understood to be for the benefit of DSC's founding shareholders, the plaintiffs herein. The fourth cause of action is based upon yet another covenant of the DSC-EMM financing agreement,[7] which provides that, if EMM should become a majority shareholder of DSC, but fails to exercise its option to purchase all outstanding DSC minority shares (before Dec. 28, 1974), EMM would cause DSC to file a registration statement with the Securities and Exchange Commission to create a public market for the outstanding minority shares, in order to prevent said shareholders from being "locked into" a corporation with unsalable equity interests. Plaintiffs allege that this covenant was intended and understood to be for their benefit (a third party beneficiary contract), and that EMM purposefully designed to frustrate the intent of this provision of the financing agreement.

Plaintiffs' fifth cause of action names Rosenberg, Taylor, Sprigle, Zechter and AM as defendants and charges each with tortious interference with, and inducement of breach of, contract (e.g., the above-enumerated provisions of the DSC-EMM financing agreement). Plaintiffs assert that each of these defendants was aware of the aforementioned covenants which were designed to protect the minority shareholders' ownership interests in an ongoing concern, and that these defendants induced EMM to default on these promises.

Causes of action six through nine are really no more than prayers for relief, and do not allege facts which set forth independent causes of action. Number six requests exemplary damages from defendants EMM, Rosenberg, Taylor and Zechter for their fraudulent behavior in disposing of the DSC assets. The seventh cause (which names AM, EMM and 12621 Chadron Ave., Inc.) requests that the court declare that plaintiffs have a "continuing equity interest" in the former DSC assets, now the property of AM, since the sale of said assets was invalid inasmuch as director approval was not given by 80 percent of the DSC board (as provided for in the DSC-EMM "purchase agreement" portion of the 1970 financing agreement). The eighth cause of action requests that the court rescind the $981,200 loan to EMM, and prohibit further distribution of those proceeds pending the outcome of this lawsuit. And nine

---

[6]This covenant was contained in paragraph 7.01 of a document entitled "option agreement," which was one of a number of writings the parties have denominated the "DSC-EMM financing agreement."

[7]Contained in paragraph 6.01 of the "option agreement."

requests that all EMM claims to the sale proceeds be subordinated to those of the minority shareholders.

After all defendants answered, counsel for defendants EMM, Taylor, Sprigle, Rosenberg and 12621 Chadron Ave., Inc., on January 7, 1974, moved for judgment on the pleadings, on the ground that the "causes of action set forth in plaintiffs' complaint fail to state" a legally cognizable claim. Defendants argued, in points and authorities in support of their motion, that plaintiffs' first (for breach of fiduciary duty and self dealing), second (for constructive fraud and breach of fiduciary duty), and eighth (a prayer to rescind the EMM loan and prohibit distribution of the DSC sale proceeds) causes of action, if injuries at all, are injuries to the corporation as a whole, and may not be sued upon by plaintiffs in their individual capacities; that plaintiffs' third (for breach of third party beneficiary contracts contained in the DSC-EMM financing agreement), fifth (for tortious inducement of breach of contract), and seventh (a request for declaratory relief to undo the sale of assets) causes of action are, again, injuries to all shareholders of DSC, and not to these plaintiffs personally and, hence, are derivative in nature; that the fourth cause of action (for failure to register DSC shares with the SEC, as covenanted) was prematurely brought; and that the sixth and ninth causes of action are prayers for relief only, and must be dismissed pursuant to the motion if the other seven causes are so dismissed.

Defendant AM filed a motion for judgment on the pleadings as well (also on Jan. 7) and argued that: (1) plaintiffs' fifth cause of action is exclusively derivative, and improperly pleaded herein as individual; and (2) plaintiffs' seventh cause of action gives rise to no cause of action against AM whatsoever (inasmuch as AM had nothing to do with the failure of the DSC board to obtain the approval of 80 percent of the directors) *unless* plaintiffs are seeking to rescind the entire transaction, in which case, they assert, the action for rescission cannot be characterized as anything but derivative.

On March 15, 1974, the trial court granted defendants' motion for judgment on the pleadings on the ground that the complaint set forth only *derivative* causes of action.[8] Plaintiffs were given 30 days to amend their complaint, but amended only insofar as to clarify their statement of

[8]The court's order on the motion reads, in relevant part: "The thrust of plaintiffs' complaint as pleaded and each cause of action and the remedy sought is necessarily derivative and not individual in nature and the complaint therefore fails to state facts necessary to state such cause in favor of plaintiffs."

facts and their prayer for money damages, and did not amend the complaint to set forth derivative actions brought on behalf of the corporation. As a result, when defendants renewed their motion for judgment on the pleadings on June 6, the trial court granted and entered judgment for all defendants.

On August 5, 1974, plaintiffs filed a timely notice of appeal from the judgment.

## ISSUE

This case presents one primary issue for resolution on appeal: Did plaintiffs' complaint set forth causes of action which might properly be brought *individually,* or are these causes exclusively *derivative* in character?[9] We have concluded, for the reasons enumerated below, that plaintiffs' complaint was properly drawn, and that the trial court erred when it granted defendants judgment on the pleadings.

## DISCUSSION

Disposition of this case on review is controlled by *Jones v. H. F. Ahmanson & Co.,* 1 Cal.3d 93 [81 Cal.Rptr. 592, 460 P.2d 464]. In *Jones,* plaintiff brought an individual action, on behalf of a class of minority shareholders of a savings and loan association, against the association's majority shareholder for breach of fiduciary duty. Plaintiff alleged that the majority shareholder (defendant) had formed a second corporation (a holding company), whose assets consisted almost entirely of defendant's shares in the association, and had proceeded to create a public market for the shares of the holding company. Initially, the association's minority shareholders were not offered an opportunity to exchange their shares for interests in the publicly marketed financial company, whose shares had greatly appreciated in value; however, defendant later offered to purchase the minority shares, but for a price far less than their real

---

[9]On appeal defendants urge this court to affirm the trial court's disposition on a variety of grounds. But it is clear from the record that the court below based its ruling on the single question of whether or not plaintiffs' causes, as pleaded, were exclusively derivative, and all parties involved so understood that ruling. To affirm the judgment on any alternative ground, at the pleadings stage, would be manifestly unfair to plaintiffs. Hence, this court will confine its discussion of the trial court's judgment to those arguments of defendants actually raised below: e.g., (1) did the complaint set forth *only* derivative actions in causes numbered one, two, three, five, seven and eight?; (2) did the seventh cause of action state any claim for relief as against defendant AM, other than one derivative in character?; and (3) was the fourth cause brought prematurely?

value. When the offer was refused the majority stockholder announced that the association would cease paying dividends on its outstanding shares. These actions by defendant had the effect of rendering plaintiffs' minority shares absolutely worthless, and as a result the minority shareholders, in their individual capacities, brought suit for damages against the majority shareholder. Defendant demurred to the complaint and the action was dismissed: the trial court concluded that the complaint stated only a derivative cause of action, and could not be brought by plaintiffs in their individual capacities. The Supreme Court reversed.

The high court noted that a breach of fiduciary duty by a majority shareholder does not necessarily give rise to either a corporate or derivative cause of action, but that the same operative facts may give rise to both causes of action simultaneously. The court concluded that a derivative action is proper where the injury alleged is one inflicted upon the corporate entity, or inflicted upon the "whole body of stock" of the corporation. (At p. 106.) The court compared this sort of action against one brought by a shareholder in his individual capacity—which must seek to enforce a right against the corporation which the shareholder possesses as an individual, and apart from the corporate entity: "The individual wrong necessary to support a suit by a shareholder need not be unique to that plaintiff. The same injury may affect a substantial number of shareholders. If the injury is not incidental to an injury to the corporation, an individual cause of action exists." (At p. 107.)

In *Jones,* the majority shareholder engaged in activities which increased the value of his shares at the expense of plaintiffs' minority shares—which were rendered valueless. In the instant case, defendants (EMM as majority shareholder and the other defendants as its agents) likewise engaged in self-enriching activities which impinged upon rights of the minority shareholders in two respects: (1) The defendants' acts deprived plaintiffs of their ownership interests in an ongoing and potentially profitable business without any compensation whatsoever; and (2) by "locking" plaintiffs into a "shell" corporation, which possesses no real assets nor engages in any kind of business activity, defendants insured that the minority's shares will forever be valueless and unsalable.[10] On the other hand, defendants managed to generate a substantial

---

[10]Defendants advance the argument (for the first time on appeal) that plaintiffs are somehow estopped to bring this lawsuit because of the peculiar nature of their promotional shares and the restrictions imposed upon them. But the fact that plaintiffs' shares were not permitted to participate in liquidating distributions is not dispositive of

sum of cash for their own purposes as a result of the sale of DSC assets. If the minority shareholders in *Jones* suffered individual injury, the minority shareholders in the instant case surely suffered injury which entitled them to bring suit in their individual capacities.

Further, plaintiffs' complaint sets forth a legally cognizable claim for which a remedy may be fashioned. The *Jones* court held that a majority shareholder may not use its power to control corporate activities for its benefit alone, or in a manner detrimental to the minority's interests. (At pp. 108-109.) Clearly, defendants' sale of the entire business and all the assets of DSC was seriously detrimental to the rights and interests of the class of promotional shareholders who are plaintiffs in this lawsuit. (See also *Brown* v. *Halbert,* 271 Cal.App.2d 252, 272 [76 Cal.Rptr. 781, 38 A.L.R.3d 718]; *Remillard Brick Co.* v. *Remillard-Dandini,* 109 Cal.App.2d 405, 418-419 [244 P.2d 66].)[11]

Lest defendants suggest that they were absolutely privileged to effectively dissolve DSC by selling its assets and business, in order to avoid serious financial losses (pursuant to Corp. Code, § 4600), it must be pointed out that the Supreme Court has held that the majority shareholders have no such unqualified right. ▪ In order to dissolve the corporation without giving rise to an action for breach of fiduciary duty, the majority must demonstrate that (1) no alternative to dissolution was available, and (2) that in dissolving the corporation the majority secured no benefit over the other shareholders. (*Jones* v. *H. F. Ahmanson & Co., supra,* 1 Cal.3d 93, 110; see also *In re Security Finance Co.,* 49 Cal.2d 370, 377 [317 P.2d 1].) ▪ The facts, as set forth in plaintiffs' complaint, provide no indication that defendants' effective dissolution of the corporation was accomplished as a matter of right.

Plaintiffs' first, second and eighth causes of action (which allege individual actions for defendants' breach of fiduciary duties) adequately

---

this appeal. As noted above, plaintiffs suffered deprivations of rights other than the right to share in the cash proceeds of the asset sale: the DSC minority shareholders were deprived of significant ownership interests and rights to share in future DSC returns. Contrary to what defendants would have us believe, the restrictions on plaintiffs' promotional shares did not make them valueless in law, nor in fact.

[11]"It would be a shocking concept of corporate morality to hold that because the majority directors or stockholders disclose their purpose and interest, they may strip a corporation of its assets to their own financial advantage, and that the minority is without legal redress." (*Remillard Brick Co.* v. *Remillard-Dandini, supra,* 109 Cal.App.2d 405, 418-419.) We feel that this comment may be appropriately applied to the case presently before us.

set forth individual causes of action, in accord with the standard set forth in *Jones*. The trial court was in error in granting defendants' motion for judgment on the pleadings in regard to these causes.

Plaintiffs' third cause of action is set forth as one for breach of contract. The contract provisions allegedly breached provide that EMM shall, if it becomes a majority shareholder in DSC, continue to advance necessary working capital to the computer company, and will "use its best efforts to . . . operate the Documentor Business . . . as to maximize the benefits to the *Shareholders.*" (Italics added.)[12] These covenants do nothing more than formalize EMM's fiduciary duty (as a majority stockholder) to the DSC minority shareholders. A breach of these contract provisions constitutes a breach of fiduciary duty on EMM's part and, as the preceding discussion of *Jones* clearly indicates, this breach creates individual causes of action with each of the injured minority shareholders.

Likewise, plaintiffs' fourth cause of action sets forth third party beneficiary contract provisions which merely delineate defendants' common law fiduciary duty not to "lock" plaintiffs into ownership of valueless stock shares (perhaps in anticipation of a *Jones* v. *Ahmanson* problem, wherein the market trading for EMM shares could, if EMM obtained a large enough percentage of DSC's outstanding shares, drive the market value of DSC shares to zero).[13] Plaintiffs' fifth cause of action has been challenged by defendants only insofar as its status (as either derivative or individual) is tied to causes three and four. Thus, the trial court erred in granting defendants judgment on the third, fourth, and fifth causes of action. (It should be noted that causes six and nine are simply prayers for relief and must follow the disposition of causes of action one through five.)

[12]On appeal, for the first time, defendants argue that plaintiffs' complaint does not adequately set forth a breach of contract action since plaintiffs have failed to establish that the contract provisions in question are third party beneficiary agreements. But the agreement specifically provides that EMM owes a duty to benefit the DSC *shareholders* —and at the time of the agreement (Nov. 1970) nearly all of DSC's outstanding stock was held by the plaintiffs, inasmuch as EMM had not yet converted its promissory notes to stock shares. Thus, on its face, plaintiffs' complaint sets forth the requisite elements of a third party beneficiary contract.

[13]Defendants' argument that the fourth cause of action is premature strikes this court as a rather duplicitous contention: In selling all of DSC's assets EMM has destroyed all value of plaintiffs' DSC shares. Arguably, this is precisely the situation the contract provision at issue was designed to avoid. Plaintiffs will not, under these circumstances, be denied access to the courts on this cause because, through artful business dealings, defendants have avoided their promised performance. It is in regard to situations such as

Only in regard to the complaint's seventh cause of action do any of the defendants raise an issue which cannot obviously be disposed of by reference to *Jones* v. *H. F. Ahmanson & Co., supra,* 1 Cal.3d 93. In cause seven, plaintiffs request that they be accorded equitable relief inasmuch as the DSC asset sale was invalid (since DSC officers failed to obtain the 80 percent director approval required by the EMM-DSC financing agreement). Defendant AM argues that this count does not state a cause of action since it was in no way responsible for the failure to obtain requisite approval, nor was it a party to the DSC-EMM agreement. AM asserts that, since it had no complicity in the inadequate ratification, the plaintiffs have no equitable rights against it, but only a derivative right to rescind the sale on behalf of the corporation.

When the sufficiency of a complaint is appraised on a motion for judgment on the pleadings, said motion will be denied if it appears that the plaintiff is entitled to *any* judicial relief—even if facts entitling him to such relief are not clearly stated or are intermingled with a statement of other facts irrelevant to the particular cause of action under scrutiny. (*Venuto* v. *Owens-Corning Fiberglas Corp.,* 22 Cal.App.3d 116, 122 [99 Cal.Rptr. 350].) Bearing the foregoing rule in mind, plaintiffs' seventh cause of action can reasonably be read as follows: AM engaged in a conspiracy with the other defendants to purchase DSC's assets in complete and knowing disregard of plaintiffs' minority shareholder interests; during the course of purchase negotiations, AM knowingly induced other defendants to breach covenants contained in the DSC-EMM financing agreement (one of which was the 80 percent director approval requirement); and for these acts plaintiffs request some sort of equitable relief (not necessarily rescission) in regard to the assets purchased by AM. So constructed, plaintiffs have alleged that AM was intimately involved in the activities which wrongfully deprived them of their ownership interest in the DSC computer enterprise. Our courts have broad equitable powers to fashion whatever remedies are needed to redress obvious wrongs. (Civ. Code, § 3523; cf. *The Atkins Corporation* v. *Tourny,* 6 Cal.2d 206, 216 [57 P.2d 480]; *Farina* v. *Bevilacqua,* 192 Cal.App.2d 681, 685 [13 Cal.Rptr. 791].) Thus, plaintiffs' cause of action was improperly dismissed inasmuch as it adequately stated a claim for relief against defendant AM.

Since plaintiffs' complaint contains facts which entitle them to individual—and not solely derivative—relief, the trial court was in error

---

this that our courts have been forced to find "prematurity" a disfavored defense. (Cf. *Seches* v. *Bard,* 215 Cal. 79 [8 P.2d 835].)

in granting defendants' motion for judgment on the pleadings. The judgment of dismissal is reversed.

Gardner, P. J., and Kaufman, J., concurred.

On August 22, 1975, the opinion was modified to read as printed above.