## COOPERATIVE MILK SERVICE, INC. *v.* HEPNER ET AL.

[No. 165, October Term, 1950.]

*Decided May 24, 1951.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*W. Earle Cobey* and *C. William Gilchrist* for the appellant.

*Thomas Lohr Richards* and *Horace P. Whitworth, Sr.*, for the appellees.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from a decree that defendant account to plaintiffs for the difference between the respective amounts paid to plaintiffs for milk shipped by them through defendant between February 1, 1950 and July 15, 1950 and the amounts they would have received if they had been paid the average prices per hundredweight received by all who shipped through defendant for all milk shipped during that period.

Defendant, Cooperative Milk Service, Inc., the Cumberland association, is a cooperative association incorporated in 1948 under the Maryland cooperative associations act. Code, Article 23, sections 430-459. Among its purposes and powers (each stated to be both) are, "To engage in any activity in connection with producing, marketing, selling, preserving, * * * packing, handling, storing or utilization of any agricultural products of its members; * * * or in any one or more of the activities specified in this Article, and to transport the products

of its members, * * *", and "To distribute to the patrons, members and non-members alike, the proceeds of the business of the Association after payment of all necessary expenses and authorized deductions to the members in proportion to the volume of business transacted by such patrons with the Association."

Defendant entered into a marketing agreement with each of its members and other producers, for a term of two years and until terminated by either party, whereby defendant bought and the producer sold to defendant all milk and milk products produced by the producer, to be delivered at such place or places as defendant might direct. By the agreement defendant was authorized "to establish from time to time, daily, weekly, monthly, or seasonal pools of the agricultural products marketed by it of the same variety, grade and quality, and all producers having such products in a particular pool shall share ratably in the net amount received therefrom", and it was provided, among other things, that "this agreement is one of a series dependent for its true value upon the adherence of each and all of the contracting parties to each and all of the said agreements, but the cancellation of this agreement or the failure of the Producer to comply herewith shall not affect other similar agreements", that "the Articles of Incorporation and the By-Laws, now or hereafter in effect, and this agreement constitute the entire agreement between the Association and the Producer" and that defendant might "enter into agreements with other producers differing in terms from those contained herein but consistent with the By-Laws of the Association without invalidating this agreement, provided that the Producer at his request may sign a similar agreement as a substitute for this agreement."

In April, 1948, defendant purchased the Cumberland milk receiving station of the Embassy Dairy (James J. Ward) of Washington, D. C. From May 1, 1948 till June 30, 1949 defendant sold its milk to Embassy Dairy, receiving the "Blend Price", which is considerably higher

than the "Manufacturers' Price" paid for milk to be sold to ice cream manufacturers and others. During this time defendant was actively engaged in trying to find another market for its milk because of uncertainty of the situation in Washington. From a survey it had found that of all milk outlets on the eastern seaboard the Washington market paid the highest blended milk price. Eighty-five per cent of the milk distributed in Washington was distributed by Maryland and Virginia Milk Producers Association, the Washington association. The Washington association was interested in securing a new milk shed in the Cumberland area. Like Washington prices, Washington requirements for qualification of producers are high. During the war, on account of milk shortage, these requirements were relaxed, and temporary Health Department permits were issued to producers, including members of defendant, who could not qualify under the strict Washington requirements. These requirements relate not only to tests of milk itself, but also to buildings and other conditions of production. New construction or reconstruction to comply with these requirements might be costly. Some of defendant's members were financially unable to incur such expense or considered that it would not pay to do so. Cancellation of temporary permits loomed ahead in the indefinite, but not remote, future.

In the spring of 1949 defendant negotiated with the Washington association regarding use of the Washington association as an outlet for defendant's milk. The matter had been brought to a head in April, 1949 when Embassy Dairy notified defendant that on and after April 18th all milk in excess of 3,000 gallons a day would be paid for on the basis of only $2.50 per hundredweight, which was approximately the manufacturers' price. This reduced the average price for all defendant's milk, received by each of its members. The Washington association advised defendant that it was not willing to accept milk and pay the blend price for it unless the milk came from shippers who were its own members and

with whom it had a marketing contract, but was interested in securing members in the Cumberland area and would be willing to buy from its own members who might use defendant's receiving station as a receiving station.

Before June 18, 1949 negotiations between defendant and the Washington association had led to sharp differences of opinion among defendant's members. In a letter from defendant's secretary to its stockholders, dated July 15th, it was said, "Your officers have contacted most of the membership and find that a majority of the members desire to market their milk through the Washington Association and these members produce over half the milk of the Association. In view of the fact that the Association does not have any definite contract with any other outlet, it is the opinion of the Board that it would be to the best interest of the producers and the Association that arrangements be affected [sic] whereby members who desire to do so and are eligible may market their milk through the Washington Association. To effect this, the Board of Directors is willing to cancel the marketing contract of all members who wish to market their milk through the Maryland and Virginia Milk Producers Association, Incorporated, upon the express condition that the members so cancelling shall remain members of the Association and agree to use the plant of the Association as a receiving station for their milk and shall give the Association an assignment of part of their account with the Washington Association to cover the cost of [handling?] and shipping their milk. * * * The Association will continue to market milk of any members who do not wish to market their milk through the Washington Association. As long as the District of Columbia permits milk from this area to enter Washington under a temporary permit, milk of all members of the Association who are not members of the Washington Association will be sold to the Washington Association. It is your Directors' hope that the Washington Association will continue paying a blended

price for this milk as they are at present. When the District of Columbia cancels its temporary permits, the Association will arrange for other outlets of the milk of its members who do not market it in Washington and secure for them the best price obtainable. The Association wishes to emphasize that the plan now being put into effect will not deprive anyone of a market for their milk. It merely gives all members a chance to market their milk in the Washington area and secure the best price obtainable for their milk. Since the temporary permits for milk from this area will probably remain in effect for several months longer, those members who at the present time are not [eligible] to go into Washington market will have an opportunity to raise their standards and take advantage of this market."

At a meeting of stockholders, in accordance with the statute (Art. 23, sec. 434), at which fifty-two members were present, amendments of the charter and the by-laws were adopted, and also, by a vote of thirty-seven for to fourteen against, a resolution authorizing the directors "to cancel the present marketing agreement of any member of the Association for the purpose of permitting such member to become a member of the Maryland and Virginia Milk Producers Association, Inc., and market his milk through such Association, upon the express condition that such member shall enter into a patron's agreement with this Association whereby the Association will act as a receiving station for his milk, and such member shall assign part of his monthly account with Maryland and Virginia Milk Producers Association, Inc., to cover the cost of operating expenses in connection with such receiving operation, and to provide capital for the Association." The minutes of the meeting state that the president, among other things, "emphasized that if Mr. Ward, of the Embassy Dairy, was correct in his statement that the temporary permits for Washington would not be removed for three years, *the milk of every member of the Association would be marketed in Washington as long as the temporary*

*permit was available, and that those members of this Association who were non-members of the Washington Association, would receive the blended price for their milk,* and this blended price was higher than any other price obtainable in the area. He went on to point out that if the temporary permits were revoked, then the Association would market the milk of members who were not members of the Washington Association in accordance with their contracts, but could not handle this milk through the local station. If they had enough milk to warrant leasing or building an additional receiving station, they would consider doing so." [Italics supplied.] The charter amendment adopted was the insertion, in a provision denying rights or vote to a stockholder who "has not for a period of twelve months marketed his agricultural products through the association", of the words "handled, processed or shipped" after "marketed". Of the by-law amendments one was the same as the charter amendment, one changed a mention of "marketing business" to "marketing or other business", one declared that the directors shall have power to authorize agreements of the association "with its patrons for the marketing of their milk, for the handling, cooling and shipping of their milk and for any other purpose permitted by the charter and by-laws", and one declared that "the association may simultaneously engage in any of the activities set forth" in the charter.

Defendant's members who became members of the Washington association each executed with defendant (1) a "memorandum of agreement" by which defendant cancelled the member's previous marketing agreement and he agreed to designate and use defendant's Cumberland plant as a receiving station for his milk, to assign to defendant part of his monthly account with the Washington association, and to sign a patron's agreement, (2) a patron's agreement by which defendant agreed "to receive, cool and store" all milk delivered to its plant in Cumberland by him and "to transport same and deliver it" to Washington or elsewhere as directed by the

Washington association, and he agreed to assign to defendant such amount from his monthly account with the Washington association as might be necessary to cover (*a*) costs of handling and transporting, (*b*) expenses, including interest and dividends on capital, (*c*) capital revolving fund, not to exceed fifteen cents per hundredweight of his milk handled and (*d*) capital reserve, not to exceed five cents per hundredweight, and (3) the assignment from his account with the Washington association. They each also executed a marketing agreement with the Washington association. The members of defendant who were also members of the Washington association constituted a majority of the members of defendant but a small minority of the members of the Washington association.

Defendant continued to collect the milk of its members who did not become members of the Washington association and sold it to the Washington association. This milk was commingled with the milk of members of the Washington association and was transported in defendant's tank trucks to Washington or other points designated by the Washington association. Each month the Washington association sent defendant a check covering the purchase of this milk at the Maryland blend price, and defendant in turn paid these members their *pro rata* share, less costs, expenses and capital "retains". The Washington association paid directly to its members the price for their milk, less the assigned deduction paid to defendant. Only members of the Washington association who had Washington permits received the Washington blend price, which was five cents more than the Maryland blend price. Only members of the Washington association received the "seasonal adjustment payment". As neither plaintiffs nor defendant make any point as to the seasonal adjustment payments or the difference between the Washington and Maryland blend prices, we need not explain or further mention these payments or this difference.

On January 18, 1950 the Washington association notified defendant that on February 1st the Washington association would discontinue purchasing milk from defendant at the blend price and would pay only the manufacturers' price. On the same day the Washington Board of Health announced that all temporary permits would be cancelled as of June 30, 1950. This date was later extended to September 1, 1950 and, we were informed at the argument, was again extended to November, 1950. On January 20th defendant wrote its members notifying them of both of the actions mentioned.

Two of the plaintiffs say that in August, 1949 they asked to be released from their contracts with defendant, but were refused. One says he then had another market available. Defendant's president says it cancelled no contracts before about September 15th or October 1st, because if it cancelled, it would have to give everybody the same privilege; about that time it cancelled the contracts of those who became members of the Washington association, and it did not stand in the way of anybody else who wanted to quit. In February, 1951 the blend price was about five dollars per hundredweight, the manufacturers' price about three dollars. Defendant made the same charge of eighty cents per hundredweight (sixty cents for expense and twenty cents for capital) for the three dollar milk sold by it to the Washington association and for the five dollar milk transported by it for members of the Washington association. Both the milk sold and the milk transported continued to be mingled. The prices and the price differential varied from month to month, the differential ranging from about $1.50 to $2. Some of the plaintiffs say the manufacturers' price, less deductions, was less than their cost of production. Defendant says it could find no better market for its members who were not members of the Washington association. Such members were not numerous enough or their supply large enough to warrant construction or acquisition of a new receiving station by defendant. As fast as they found other

markets, they gave up their contracts with defendant and sold elsewhere. By July 16, 1950 not one non-patron member was selling to defendant.

On April 14, 1950 plaintiffs filed their bill for an accounting. Of the eleven plaintiffs eight attended the stockholders meeting on August 22, 1949, and presumably voted against the action there taken. Of the five plaintiffs who testified all except one, who was not present, voted and also voiced their opposition at the meeting. Three of the plaintiffs, who happen to be the three who did not attend the meeting, were held entitled to no relief, because they had executed releases when they gave up their contracts. The other eight by the decree below were held entitled to the accounting awarded.

Plaintiffs contend, and the lower court in effect held, that defendant's action constituted a breach of trust, and was illegal under its charter and by-laws and under the cooperative associations act, under its marketing agreement with plaintiffs, and under "general cooperative law and practice".

Cooperative associations differ from ordinary business corporations principally in that they do most of their business with their own members. Art. 23, sec. 430. Among statutory differences are limitation of members to one vote each (*ibid.*) and prohibition of voting by proxy (Art. 23, sec. 447), with a narrow exception. Art. 23, sec. 450. It may be doubted whether an ordinary business corporation, if and when it deals with its stockholders as such, is under any less duty of fairness and equality than a cooperative. Stockholders are not trustees or *quasi* trustees for each other. *Shaw v. Davis,* 78 Md. 308, 318, 28 A. 619, 23 A. L. R. 294. But when majority stockholders use their voting power for their own benefit, for some ulterior purpose adverse to the interests of the corporation and its stockholders as such, they thereby become fiduciaries and violate their fiduciary obligations.

Not unnaturally plaintiffs felt that injustice had been done when their milk was commingled in the same tanks

with other members' milk and they received three dollars per hundredweight for their milk and other members received five dollars. The lower court in its opinion, referring to defendant's members who were not members of the Washington association, said, "In fairness to them, and in fairness to the local Co-op., the Washington Association should have continued to pay the blend price to all until the temporary Washington permits were actually revoked." Against this view it may be said for the Washington association that impending cancellation of the temporary permits, which threatened plaintiffs with loss of a market, also threatened the Washington association with loss of part of its supply. The Washington association, therefore, paid the highest price to producers who had become its own members and had fitted themselves, or would fit themselves, to continue to sell in Washington after cancellation of the temporary permits. If, however, we should unite— for rhetorical purposes only, since the Washington association is not a party to this case and we cannot make a decree against it—in the lower court's condemnation of the Washington association, the question would still remain whether defendant did anything unfair or unlawful to bring about the result.

There was nothing unfair or unlawful in anything done or left undone by defendant after the announcement of price reduction in January, 1950. Defendant may have been dominated by members of the Washington association, but the Washington association was not dominated or controlled by defendant or its members, and there is no evidence that the Washington Health Department was controlled by either defendant or the Washington association.

Plaintiffs contend that defendant's original action in the summer of 1949 in authorizing release of marketing agreements and substitution of patron's agreements with its members who became members of the Washington association was unfair and unlawful. Plaintiffs say that defendant's duty of equality in treatment of its members

limited it to one uniform contract with all its members for a single activity. Early statutes in other states, or narrow charter purposes or powers under the Maryland act, might furnish support for such a contention. In the instant case this contention is contrary to the statute, to defendant's charter and to the marketing contract itself. The act provides that each association shall have power "To engage in any activity in connection with producing, marketing, selling, preserving, * * * handling, storing or utilization of any agricultural products of its members; * * * or in any one or more of the activities specified in this sub-section, and to transport the products of its members * * *." Art. 23, sec. 437. Manifestly, this provision does not restrict defendant to a single activity. For present purposes, the provision above quoted from defendant's charter is no narrower than this provision of the act; the two provisions are practically identical. *Cf. California C. P. Growers v. Harkey*, 11 Cal. 2d 188, 78 P. 2d 1137; *Packel on Cooperatives*, (2d Ed.) §§ 11 (d) and 43.

The by-law amendment declaring that "the association may simultaneously engage in any of the activities set forth" in the charter was not necessary to remove any previous restriction, and added nothing to the powers of the association under the statute and its charter. The other by-law amendments and the charter amendment merely broadened some words in subsidiary details and were not needed to remove any previous restriction upon the statutory and charter powers of the association. It is therefore unnecessary for us to consider the scope of the power of charter and by-law amendment conferred by statute and at least recognized in the marketing agreements. The marketing agreement also, in a provision above quoted, expressly provides that defendant may "enter into other agreements with other producers differing in terms from those contained herein * * * provided that the Producer at his request may sign a similar agreement as a substitute for this agreement."

We may assume that defendant could not lawfully make any arbitrary discrimination between its members, *e.g.*, between those who were and those who were not members of the Washington association; that it could not benefit one class at the expense of another by giving more favorable terms to one class, knowing that the other class was not able to take advantage of such terms. The defendant did not make any such discrimination. Defendant did nothing to create the conditions which gave members of the Washington association any advantage over its other members. All its members were faced with loss of the Washington market through enforcement of the Washington requirements of milk producers. This market could be saved by defendant's individual members by complying with the Washington requirements, and to this end becoming members of the Washington association. Defendant was not under any duty to let all its members drown because some of them could not swim and either could not afford the cost of learning or did not consider the cost of learning worth while.

Plaintiffs say defendant's action was unlawful because of the "assurances" given them that the blend price would continue to be paid until cancellation of the Washington temporary permits. The "assurances" referred to are the above quoted statement in the letter of July 15, 1950 and the above quoted and italicized statement by defendant's president at the stockholders' meeting on August 22nd. The difference between the two statements is that what is stated in the letter as a hope, was stated at the meeting as a fact or (to speak more accurately) a prediction. Plaintiffs do not contend that this statement was made fraudulently, with intent to deceive. The lower court finds that defendant's officials "were led to believe this purchase of all its milk at the 'blend price' would continue until the temporary wartime permits were revoked by the Washington Health authorities." There is no evidence that defendant in bargaining with the Washington association could have

obtained any undertaking that such purchase would be so continued. The testimony, and the interest of the Washington association in getting new members, indicate that it would not have given such an undertaking.

In equity, *e. g.,* in specific performance or recission, relief may be had for misrepresentations, without showing all the requisites for an action for deceit. This does not mean that a suit for pecuniary damages for innocent misrepresentation may be maintained in equity, without any other ground of equity jurisdiction, whenever an action for deceit cannot be maintained. Whether a demand that defendant "make good" or perform its representations would be a ground of equity jurisdiction or only a figure of speech, we need not decide. This is not such a suit. Moreover, in equity, as at law, a misrepresentation, to constitute a ground for relief, must be material. *Clark v. Kirsner,* 196 Md. 52, 74 A. 2d 830. If the statement at the meeting on August 22nd was more than the "hope" expressed in the letter of July 15th, plaintiffs in any event did not rely on it. Before the meeting plaintiffs and others were opposed to the action proposed; at the meeting they voted against that action. None of them did, or left undone, anything in reliance on any representation by defendant or its officers.

At the argument plaintiffs stressed the facts (1) that in August, 1949 two of the plaintiffs asked to be released from their marketing agreements and where refused and (2) that after January, 1950 defendant deducted the same eighty cents per hundredweight from the proceeds of sale of plaintiffs' three dollar milk that they charged for handling their "patrons' " five dollar milk. We need not decide whether in August, 1949 fundamental facts and conditions underlying the marketing agreements had so changed as to entitle an individual producer to terminate his contract. Plaintiffs did not attempt to terminate their marketing contracts but are now suing to enforce those contracts in a way which we hold is not warranted under the contracts. Nor need we decide whether, after January, 1950, defendant under its contracts should have

made a larger charge for expense in handling five dollar milk than for selling three dollar milk. The wording of the marketing agreement and the patron's agreement with respect to expense and capital "retains" is not identical, but seems substantially the same. Items (*b*) and (*c*), relating to capital "retains", are practically identical, and prescribe maxima of fifteen cents and five cents per hundredweight; under both agreements defendant has been charging these *maxima*. If we assume that it might have been arguable that fairness and the presumed intention of the parties required that in apportioning expenses, and perhaps capital "retains", between producers and patrons not only weight but also value should have been taken into account, again this is not such a case. Plaintiffs are not suing to require that inequality in prices be reflected in charges for expenses and capital "retains" but to abolish inequality in prices by equalizing prices to producers and patrons. We could not now authorize the nature of this case to be revolutionized in this respect.

As we hold that plaintiffs were never entitled to the relief sought, and granted by the decree below, we need not consider whether any right to relief would have been barred by failure to assert it promptly after the action taken by defendant in August, 1949.

*Decree reversed, with costs, and bill dismissed.*