*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

## No. 16-CV-624

HOWARD B. SILBERBERG, *et al.*, APPELLANTS,

v.

JOANNE S. BECKER, *et al.*, APPELLEES.

**08/16/2018**
FILED
District of Columbia
Court of Appeals
Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(CAB-5970-14)

(Hon. Michael K. O'Keefe, Trial Judge)

(Argued September 19, 2017                    Decided August 16, 2018)

*Mark P. Friedlander, Jr.* for appellants.

*Stephen D. Charnoff* for appellees.

Before THOMPSON and MCLEESE, *Associate Judges*, and PRYOR, *Senior Judge.*

THOMPSON, *Associate Judge*: This matter returns to this court after a remand to the trial court and an ensuing May 27, 2016, order (the "May 27 Order"). The May 27 Order granted the motions by appellees Joanne Becker, Brian Becker, Adam Becker, and Robin Tacchetti (hereinafter referred to individually by their first names and collectively as "the Beckers") to dismiss

under Super. Ct. Civ. R. 12 (b)(6), or in the alternative to dismiss as moot, the Amended Complaint filed by appellants Howard Silberberg, Rachel Silberberg Sulkin, and Jason Silberberg (hereinafter referred to individually by their first names and collectively as "the Silberbergs").  We reverse and remand for further proceedings.

## I.    Background

At all relevant times the plaintiff Silberbergs and the defendant Beckers were the sole shareholders of the Shenandoah Corporation ("Shenandoah"), a small family corporation engaged in the ownership and operation of two multi-unit apartment buildings in the District of Columbia.  The Silberbergs own a total of 47.5% of Shenandoah's issued and outstanding capital stock, and the Beckers own a total of 52.5%.

The Silberbergs' Amended Complaint asserts that in 2013, "there was a division within the families owning Shenandoah," with the Beckers "wish[ing] to sell the two apartment buildings and terminate the corporation," while the Silberbergs "did not wish to sell the buildings or terminate Shenandoah."  On January 15, 2014, a special meeting of Shenandoah's Board of Directors and

shareholders was held, at which all the shareholders were present either in person or by proxy, and the directors unanimously adopted a resolution to enter into a Stock Redemption Agreement (the "SRA" or the "Agreement") "for the purpose of . . . redeeming all of the issued and outstanding stock of [Shenandoah]" owned by Joanne, Adam, and Robin. Under the terms of the SRA, closing was to occur on or about April 24, 2014. The Amended Complaint asserts that the SRA was "carefully negotiated" "[i]n order to accommodate the diverse wishes of the two family factions and in order to benefit the Beckers' desire for the immediate cash from a sale of the apartment buildings, and in order to benefit the Silberbergs' desire to preserve the corporation in order to continue the ownership of the properties through the corporation." The stock redemption described in the SRA would leave the Silberbergs with 95% ownership of Shenandoah.

Also at the January 15, 2014, special meeting, Howard and Rachel were elected as directors, Howard was elected President, and Rachel was elected Secretary of Shenandoah. On January 30, 2014, just a few weeks later, another shareholders meeting was held. The Silberbergs contend that, in violation of District of Columbia law and Shenandoah's by-laws, the meeting notice was given electronically and the (telephonic) meeting, attended solely by the Beckers, was conducted with "less than forty-eight hours' notice." At the January 30, 2014,

meeting, the majority shareholders (the Beckers) elected (or purported to elect) Joanne and Brian to be directors, and the new directors elected (or purported to elect) Brian as President and Robin as Secretary of Shenandoah. Then, on July 14, 2014, notwithstanding what the Silberbergs contend was the contrary purpose of the SRA, Brian, purportedly on behalf of Shenandoah, signed a Purchase and Sale Agreement, agreeing to sell one of the two Shenandoah properties to Phoenix Tenants' Association ("Phoenix"). On September 2, 2014, Brian, again purportedly acting on behalf of Shenandoah, signed a Purchase and Sale Agreement agreeing to sell the other property to New Beginnings Tenants' Association ("New Beginnings"). Brian also closed out Shenandoah's account at Sonabank by withdrawing the entire balance of the account ($244,572.79) on September 5, 2014, and (initially) depositing that money into a Bank of America account in his own name.

Appellants filed their original Complaint on September 20, 2014, seeking declaratory relief against the Beckers, Phoenix, New Beginnings, and RE/MAX Allegiance ("RE/MAX") (the real estate listing agent for the properties) and an award of monetary damages from the Beckers. Specifically, in Count I, the Silberbergs sought a declaration that the purported corporate actions taken by the Beckers were unlawful and null and void and that the agreements with RE/MAX,

Phoenix, and New Beginnings were null and void. In Count II, the Silberbergs sought damages from the Beckers for breach of the SRA. And in Counts III-V, the Silberbergs sought, respectively, damages for breach of fiduciary duties owed to the Silberbergs by Joanne, by Brian, and by the Beckers as majority shareholders. The Beckers filed a motion to dismiss pursuant to Super. Ct. Civ. R. 12 (b)(6) and R. 12 (b)(7). In a November 21, 2014, Order, the trial court granted the Beckers' Rule 12 (b)(6) motion, dismissing Count II with prejudice and the other Counts without prejudice. On December 8, 2014, the Silberbergs filed a Notice of Appeal to this court.

On January 26, 2015, while the appeal was pending, an annual meeting of the shareholders of Shenandoah was held and an annual meeting of the directors followed on January 26-27. The Silberbergs do not dispute that these meetings were properly noticed and held and resulted in the election of Becker family members to the Shenandoah Board. Specifically, at the shareholders' meeting, Brian, Joanne, and Robin were voted directors, and the Becker majority voted to rescind the SRA, to ratify the RE/MAX listing agreements, to ratify the Phoenix and New Beginnings purchase-and-sale agreements, and to "ratify all actions taken by Brian Becker and Joanne Becker as directors of Shenandoah" and "all actions taken by Brian . . . and Robin . . . as Shenandoah's officers through January 26,

2015." At the Board of Directors' meeting, Brian was elected as Shenandoah's President, Joanne was elected Treasurer, and Robin was elected Secretary. The Board also voted to ratify all actions taken by Brian and Joanne as Shenandoah's directors and all actions taken by Brian and Robin as Shenandoah's officers through January 26, 2015; to sell Shenandoah's properties "as quickly as possible"; and to compensate the directors for their service. On March 5, 2015, through an action in lieu of meeting, the Board voted to terminate and rescind the SRA.

After the January and March 2015 meetings and actions described above, the Beckers filed a motion in this court to deem the pending appeal moot, arguing that appellants sought relief with respect to sales contracts and a rescission of the SRA that had been "ratified, affirmed, [and] reauthorized . . . in 2015 by Shenandoah via the actions of the Board of Directors elected without dispute on January 26, 2015" and that "the trial court ruling on outdated matters would be purely academic." This court remanded the matter on May 18, 2015, stating that "it appear[ed] from a review of all motions filed that events have occurred that may impact th[e] litigation and that the impact is more properly brought first in the Superior Court." The order stated that the remand to the trial court was for "the parties to file appropriate motions to determine the impact of the latest events in this litigation"

and that "[i]f any party remains aggrieved upon the conclusion of the matter in the trial court, it shall file a new notice of appeal."

Back in the trial court again, the Silberbergs filed their Amended Complaint on October 26, 2015 (and, on November 18, 2015, dismissed their claims against RE/MAX). The Beckers filed a motion to dismiss the Amended Complaint as moot and a motion to dismiss the amended complaint pursuant to Rule 12 (b)(6). In the May 27 Order that is the subject of the instant appeal, the trial court granted both motions and dismissed all Counts with prejudice. The trial court dismissed Count I, which sought a declaration about the alleged invalidity of purported corporate actions and agreements, because the claims belonged to Shenandoah, not the Silberbergs, and could be brought by the Silberbergs only through a derivative action and upon satisfying the requirements for bringing such an action (which the Silberbergs had not done). In dismissing Count II (breach of contract) pursuant to Rule 12 (b)(6), the trial court stated first that it had previously (in its November 21, 2014, Order) dismissed the Count with prejudice, a ruling that the court said remained in effect because this court had not vacated it. The trial court reasoned in addition that even if the contract claim was not barred by that earlier ruling, the court would still dismiss it with prejudice because the Silberbergs could not establish that they were intended third-party beneficiaries of the SRA.

The trial court dismissed the Count III breach-of-fiduciary-duty claim against Joanne on the ground that the Amended Complaint "includes no specific facts as to what actions Joanne . . . took that disregarded Shenandoah's or its shareholders' best interests." The court reasoned that Joanne's participation in the allowance of director and officer compensation failed to state a claim because, under the company's by-laws, "directors may receive compensation and officers may be salaried." The court found that the Count IV breach-of-fiduciary-duty claim against Brian failed to state a claim "for the same reasons." The court stated that there was "nothing inherent" in the Silberbergs' "bald allegations" about Brian's actions (e.g., his withdrawing of Shenandoah funds from the Sonabank account and issuing dividends at different times to the Beckers and the Silberbergs) that constituted poor business judgment. As to both Counts III and IV, the court reasoned that the Silberbergs had not shown how their claims "overcome the protection of the business judgment rule." Regarding the allegations of Count V, i.e., that the Beckers as majority shareholders had acted in disregard of the Silberbergs's rights as minority shareholders and that the Silberbergs had been "financially damaged," the court found the claims "bare and conclusory."

Finally, the trial court ruled that "[e]ven if the Amended Complaint were not dismissed under Rule 12 (b)(6), it would be dismissed on mootness grounds." Emphasizing that the Silberbergs had "not challenged the propriety of the 2015 annual meetings," the court concluded that to the extent the Silberbergs' Amended Complaint claimed that the Beckers had acted "without proper Board approval," all of the Beckers' challenged actions, including their decision to "hinder, prevent performance [of,] and . . . abrogate" the SRA, "w[ere] ratified at the 2015 annual meetings."

On June 21, 2016, the Silberbergs filed a second Notice of Appeal, listing the May 27 Order as the "order appealed from." In their briefs on appeal, they contend that the trial court erred in ruling (1) that they had failed to properly plead a claim for breach of contract as third-party beneficiaries of the SRA; (2) that their contract claim became moot when Shenandoah's majority shareholders and directors voted in 2015 to rescind the SRA; and (3) that they had no cause of action against the Beckers, as Shenandoah's directors and majority stockholders, for breach of fiduciary duties owed to the Silberbergs as minority stockholders in a

family corporation.[1] The Silberbergs highlight that the trial court dismissed the case as moot even though the Beckers "attempted to rescind the [SRA] *after* the Silberbergs had already filed this court action to enforce it," and the Silberbergs also suggest that the court's mootness-based-on-ratification ruling "ignor[ed] the fiduciary obligations of the Beckers" to the Silberbergs that were violated when the Beckers "raid[ed] the corporate treasury over the objection of the Silberbergs." (emphasis added). The Beckers defend the trial court's rulings.[2]

## II. Standard of Review

---

[1] By stipulation, the Count I claims, counterclaims, and cross-claims between the Silberbergs, Phoenix, and New Beginnings were dismissed, and the Silberbergs do not appeal the dismissal of Count I as against the Beckers.

[2] The Beckers note that the Silberbergs, in their June 21, 2016, Notice of Appeal, failed to list the November 21, 2014, order as an "order appealed from," and argue that the Silberbergs thus did not preserve their claim that Count II was erroneously dismissed with prejudice in the November 21, 2014, order. The trial court, too, reasoned that this court's remand order left the November 21, 2014, dismissal of Count II with prejudice undisturbed. However, this court specifically granted "appellants' motion to remand," not appellees' motion, and appellants' motion asked this court to "vacate the trial court's Rule 12 (b)(6) Dismissal Order, without prejudice . . . and remand the file back to the trial court." Construing our remand order, we conclude that it did disturb the trial court's dismissal of Count II with prejudice, and that the Silberbergs' appeal from the May 27 Order, which reiterated the trial court's grounds for dismissing Count II, preserved for this appeal the claim that the dismissal of Count II was error.

We review "*de novo* a dismissal under Super. Ct. Civ. R. 12 (b)(6) for failure to state a claim on which relief can be granted." *Poola v. Howard Univ.*, 147 A.3d 267, 276 (D.C. 2016). In reviewing the dismissal order, "we construe the complaint in the light most favorable to the plaintiff[s] and take [the] factual allegations as true." *Id.* We have adopted the pleading standard articulated by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), requiring a complaint to "plead 'enough facts to state a claim to relief that is plausible on its face.'" *Poola*, 147 A.3d at 276 (quoting *Twombly*, 550 U.S. at 570). This means that the complaint must plead "'factual content that allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged.'" *Id.* (quoting *Comer v. Wells Fargo Bank, N.A.*, 108 A.3d 364, 371 (D.C. 2015)).

We review the issue of mootness, a question of law, *de novo*. *See Fraternal Order of Police, Metro. Labor Comm. v. District of Columbia*, 82 A.3d 803, 814 (D.C. 2014).

## III.   Analysis

A. The Count II Breach-of-Contract Claim Brought by the Silberbergs as Putative Third-Party Beneficiaries

### 1. Whether the claim is moot

The trial court found that Count II, under which the Silberbergs seek to enforce their (putative) rights as third-party beneficiaries under the SRA, is moot because the reconstituted Shenandoah Board voted in 2015 to rescind the SRA. Appellants do not dispute that the Board would otherwise have had the authority to rescind the SRA, but argue that the Board lacked that power because, the Silberbergs, "months prior to [the January 2015 shareholders meeting and the March 2015 Board action in lieu of a meeting], had already filed this action seeking, in part, to enforce their third party beneficiary rights under the Agreement." Thus, the Silberbergs argue, the purported rescission of the SRA was a nullity and did not render their contract claim moot.

### a. Applicable law

We begin by articulating the legal principles that will guide our resolution of the mootness issue as well as the issue of whether the trial court erred in dismissing the Silberbergs' contract claim on the basis of the court's rejection of their asserted third-party-beneficiary status.

"In order to sue for damages on a contract claim, a plaintiff must have either direct privity or third party beneficiary status." *Fort Lincoln Civic Ass'n v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1064 (D.C. 2008) (internal quotation marks omitted). "Third-party beneficiary status requires that the contracting parties had an express or implied intention to benefit directly the party claiming such status." *Id.* (internal quotation marks omitted); *see also Fields v. Tillerson*, 726 A.2d 670, 672 (D.C. 1999) ("A third party to a contract may sue to enforce its provisions if the contracting parties *intend* the third party to benefit directly thereunder." (internal quotation marks omitted)). "[A]n indirect interest in the performance of the [contractual] undertakings is insufficient." *Fort Lincoln*, 944 A.2d at 1064 (internal quotation marks omitted). "To be intended, a beneficiary need not be named in the contract, as long as he or she is ascertainable from the contract and the circumstances of the contract." *Hossain v. JMU Props., LLC*, 147 A.3d 816, 820 (D.C. 2016) (internal quotation marks omitted); *see also Western Union Tel. Co. v. Massman Constr. Co.*, 402 A.2d 1275, 1277 (D.C. 1979) ("[T]he absence of the third party's name from the contract is not fatal to his claim, especially when the surrounding circumstances tend to identify the third-party beneficiary.").

The "modern majority rule" is that "parties to a contract entered into for the benefit of a third person may rescind, vary, or abrogate the contract as they see fit, without the assent of the third person, at any time before the contract is accepted, adopted, or acted upon by him," and that "such rescission deprives the third person of any rights under . . . such contract." *Fields*, 726 A.2d at 672-73 (internal quotation marks omitted). The "current majority rule," which this court has adopted, recognizes that the power the promisor and promisee retain to modify or discharge a duty '"terminates when the beneficiary, *before he receives notification of the discharge or modification*, materially changes his position in justifiable reliance on the promise *or brings suit on it* or manifests assent to it at the request of the promisor or promisee."' *Id.* at 673 (emphases added) (quoting Restatement (Second) of Contracts § 311 (3) (Am. Law Inst. 1981)).

### b. Application of the law to this case

In addition to disputing the Silberbergs' claim that they were intended third-party beneficiaries of the SRA, the Beckers contend that the 2015 action by the Becker-controlled Board of Directors to rescind the SRA rendered the Silberbergs' breach-of-contract claim moot. As we did in *Fields*, we begin our analysis of mootness by "assuming that [the parties to the SRA] . . . intended [the party

asserting third-party-beneficiary status] to be a third-party beneficiary" of the agreement and asking whether "some action thereon [by the putative third-party beneficiary] terminated th[e] power" of a party to the agreement to rescind the agreement. *Id.* Here, it is undisputed that the Silberbergs sued to enforce the SRA in September 2014, before "official corporate action [i.e., the March 5 vote by the Shenandoah Board and the January 2015 vote by majority shareholders was] . . . taken by the Beckers to declare a 'rescission' of the SRA." The Silberbergs assert that they also relied on the Agreement by arranging a loan to Shenandoah to repurchase the shares held by Joanne, Robin, and Adam. The Beckers downplay that action by the Silberbergs (asserting that it required the most minimal of effort and detriment), but under the rule articulated in Restatement (Second) of Contracts § 311, the filing of the instant lawsuit sufficed to curtail the ability of the parties to the SRA to nullify the Agreement. We conclude that if the Silberbergs were third-party beneficiaries of the SRA, the action by the Becker-controlled Board to rescind the SRA in 2015 did not moot the Silberbergs' breach-of-contract claim. We therefore proceed to what we find to be the more difficult question: whether the Silberbergs are entitled to proceed on their claim that they are third-party beneficiaries of the SRA.

> 2. Whether the Silberbergs are entitled to proceed on their claim that they are third-party beneficiaries of the SRA

As appellees emphasize, by its terms, the SRA was an agreement between Shenandoah and Joanne, Robin, and Adam; the Silberbergs were not parties. Thus, a necessary condition of the Silberbergs' pursuit of a contract claim for breach of the SRA is that they have third-party beneficiary status.

In support of their claimed third-party beneficiary status, the Silberbergs pled in their Amended Complaint that "it was understood and agreed that the intended and direct beneficiaries [of the SRA] were all of the Silberbergs," who "would, by virtue of the Agreement become the 95% owners of Shenandoah and would be able to keep the corporate existence, to retain the two properties and not have to sell them." Similarly, the Amended Complaint asserts that the "Agreement was made and intended by all the parties for the direct benefit of" the Silberbergs, who "would and are to become owners of ninety-five percent (95%) of Shenandoah's issued and outstanding capital stock and . . . could then deal with the properties and Shenandoah's other business affairs as [they] determined." The Amended Complaint asserts that the Silberbergs "had secured financing . . . and there was cash ready for the full implementation of the [SRA]," avoiding a sale of the properties that the Silberbergs' brief asserts "would trigger substantial federal and District of Columbia income taxes approximately equal to 45% of the net sale

price." The Silberbergs argue that "the trial court ignored the carefully negotiated 'deal' between the Silberbergs and Beckers that would have resulted in each side gaining what they sought" — "the Becker family members would receive the cash they were seeking" and the "Silberbergs would achieve control of the corporation." The Silberbergs emphasize that they are signatories to the minutes of the meeting that authorized Shenandoah to enter into the SRA and that "Howard signed the Agreement as Shenandoah's president." They urge this court to hold that whether they are third-party beneficiaries is a factual issue that "must be resolved at a trial on the merits."

The Beckers emphasize that the SRA does not refer to any of the Silberbergs or to any shareholders other than Joanne, Robin, and Adam by name. The Beckers also note that section 11 of the SRA states that it "'shall inure to the benefit of'" Shenandoah and the Becker group, without mentioning the Silberbergs or other shareholders. This, the Beckers contend, compels a conclusion that the parties did not "directly and unequivocally intend the Agreement to benefit" the Silberbergs (quoting *Oehme, van Sweden & Assocs., Inc. v. Maypaul Trading & Servs., Ltd.*, 902 F. Supp. 2d 87, 100 (D.D.C. 2012) (internal quotation marks omitted)). The Beckers also argue that section 13 (b) of the SRA, which states that the agreement

"sets forth all of the . . . understandings . . . among the parties," "is fatal to the Silberbergs' third-party beneficiary claim."

The Beckers further point out that the payout to Joanne, Robin, and Adam totaling $680,000 for all their shares would have left the Silberbergs with a reduced ability to receive distributions from Shenandoah ("due to the entity taking out a $680,000.00 loan"), all the while leaving the Silberbergs with no more shares than they had before and with a benefit that would "necessarily rise[] and fall[] on [Shenandoah's] fortunes or misfortunes." Thus, the Beckers say, any benefit to the Silberbergs was "indirect, at best." The Beckers also rely on *Glass v. United States*, 258 F.3d 1349 (Fed. Cir. 2001), in which the United States Court of Appeals for the Federal Circuit stated that "in order to make a shareholder a third party beneficiary, the contract must express the intent of the promissor to benefit the shareholder personally, independently of his or her status as shareholder." *Id.* at 1353-54.

We are not persuaded by the Beckers' arguments. The Silberbergs' claimed status as third-party beneficiaries does not rely on their mere status as shareholders. Rather, the Silberbergs rely on their status as individuals who, as a family group, would become *majority* shareholders of Shenandoah upon performance of the

SRA, with decision-making power that would enable them to realize their desire to "continue the ownership of the properties through the corporation." Amended Complaint, ¶14. The (alleged) contemplated benefit to the Silberbergs was that immediate direct benefit, not (as in *Glass*) the indirect, speculative benefit that the Silberbergs would derive from the value of the Agreement to the corporation, or the speculative profits from the corporation's contemplated continued ownership of its assets. Stated differently, this is not a case in which the intended benefit that the Silberbergs claim gives them third-party beneficiary status is one that is merely a "benefit deriving by way of [the corporation's] operating at a profit and thus generating dividends to [plaintiff]." *Dow Corning Corp. v. Chemical Design, Inc.*, 3 F. Supp. 2d 361, 366 (W.D.N.Y. 1998).

Further, while the Silberbergs are not mentioned in the SRA, they signed the minutes of the special meeting at which the directors resolved to enter into the SRA. We see this involvement of all of the Silberberg appellants — a "surrounding circumstance[]" of the SRA, *Western Union*, 402 A.2d at 1277 — as significant because the only other "Annual Meeting of the Shareholders" minutes included in the record are not signed by *any* shareholders (other than Robin in her capacity as Secretary). Also, Howard signed the SRA on behalf of Shenandoah. Thus, his involvement was "plainly ascertainable from the four corners of the

contract," *Hossain*, 147 A.3d at 820, a fact that supports his third-party beneficiary status. And, if (as we must) we accept as true the factual allegations of the Amended Complaint, we can assume that Howard, on behalf of Shenandoah, intended all the Silberbergs to be third-party beneficiaries of the Agreement.[3]

Also ascertainable from the four corners of the Agreement is that the Agreement had something to do with not selling the properties, because the Agreement includes a provision requiring the Becker group to indemnify Shenandoah against any claim by RE/MAX relating to the Agreement and to obtain a release from RE/MAX of any claim it might have arising out of the real estate listing agreements (which would have been canceled once the Silberbergs became majority shareholders). Since, according to the Amended Complaint, the entire purpose of the Agreement was to resolve the dispute between the family factions about selling the properties or not and the Agreement would enable the Silberbergs to realize their objective of *not* selling, inclusion of those indemnity and release requirements in the Agreement at least arguably means that it is

---

[3] Restatement (Second) of Contracts § 302 (1) (Am. Law Inst. 1981) (stating that "[u]nless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if . . . the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance").

ascertainable from the four corners of the Agreement that the Agreement was intended to facilitate the goal of the Silberbergs. Indeed, in light of the undisputed fact that Shenandoah would have been required to take out a large ($680,000) loan to repurchase the shares held by Joanne, Robin, and Adam, but had "a cash balance of [only] $250,000" (and thus presumably was not repurchasing shares to utilize excess cash[4]), it is difficult to imagine what purpose Shenandoah had in entering into the Agreement other than to benefit the group of its shareholders who wanted the corporation to retain the properties and who would be its residual majority-shareholder group.[5]

---

[4] Case law reflects that this is a typical reason for a corporation to repurchase its stock. *See, e.g.*, *In re The Limited, Inc. S'holders Litig.*, No. 17148-NC, 2002 Del. Ch. LEXIS 28, at *6 (Mar. 27, 2002) ("[T]he stock repurchase was the most attractive method for utilizing the Company's excess cash[.]"); *Frank v. Arnelle*, No. 15642,1998 Del. Ch. LEXIS 176, at *7 (Sept. 16, 1998) (quoting a company Offer to Purchase explaining that the company "had been using a substantial portion of its excess cash to repurchase shares").

[5] *Cf. Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 567, 569, 574 (2d Cir. 1991) (holding that the district court correctly found that the Sudan was the intended third-party beneficiary of an agreement between Trans-Orient and CIDCO in which Trans-Orient accepted Star as shipping agent, "because mere acceptance of Star's appointment served little purpose if Trans-Orient could assert a claim against the Sudan" (internal quotation marks omitted)); *Solutia Inc. v. FMC Corp.*, 385 F. Supp. 2d 324, 338 (S.D.N.Y. 2005) ("In determining whether a third party has standing to enforce a contract, the [c]ourt must look at the overall purpose of the transaction." (internal quotation marks omitted)); *McClare v. Mass. Bonding & Ins.*, 195 N.E. 15, 16-17 (N.Y. 1935) ("No other purpose [of the agreement] appearing than to benefit the two classes of creditors named, they are to be considered beneficiaries[.]").

Although the SRA states that it "shall inure to the benefit of . . . the Corporation and . . . each of the members of the Becker Group," courts have found third-party beneficiary status despite such language when there are (as there are here) other indicators of intent to confer a third-party benefit. *See, e.g.*, *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 429 & n.18, 430-31 (S.D.N.Y. 2010) (denying motion to dismiss third-party beneficiary breach-of-contract claim despite contract language stating, "This Agreement shall be binding on and inure for the benefit of the parties and their respective successors and permitted assigns"; reasoning that "[c]onflicting evidence requires the benefit of discovery and development of the factual record to aid in construing the contracts and discerning the parties' intent" (internal quotation marks omitted)). And, unlike in *Fort Lincoln*, a case on which appellees rely, the SRA does not contain "explicit language . . . [stating that] 'no person other than a party to this Agreement, or a successor or assign, shall have any right to enforce the terms of this Agreement against a party, its successors or assigns,'" 944 A.2d at 1069 (quoting the language of the agreement in question), language that this court said dictated a conclusion that the plaintiffs "could not reasonably rely on the [agreement in question] as conveying the parties' intent to confer on them the right to file . . . an action" to enforce the agreement, *id.* Further, unlike in *FiberLight, LLC v. Nat'l R.R.*

*Passenger Corp.*, 81 F. Supp. 3d 93 (D.D.C. 2015), the Agreement does not state that nothing contained in it "is intended to confer on any person other than the parties . . . any rights [or] remedies." *Id.* at 109 (emphasis and internal quotation marks omitted).

"The underlying question of whether the shareholders are third party beneficiaries to the . . . contract is a mixed question of law and fact[.]" *Glass*, 258 F.3d at 1353. For the foregoing reasons, and on the undisputed facts and the factual allegations of the Amended Complaint that we accept as true for purposes of our analysis, we are unable to say as a matter of law that the Silberbergs will be unable to prove to a jury that they were intended third-party beneficiaries of the SRA. There are factual issues as to whether the circumstances of negotiation and execution of the SRA and the parties' intent were as the Silberbergs have alleged. Thus, there are factual issues "unresolved [in] the trial court" bearing on the Silberbergs' claimed status as third-party-beneficiaries. *Fields*, 726 A.2d at 672. As in *Fields*, those issues require a remand to the trial court.

In remanding, we recognize that there may be impediments to the Silberbergs' breach-of-contract claim even if they prove their asserted third-party beneficiary status. As noted above, the SRA contains a provision requiring, as a

condition that must occur before closing, a "release . . . signed by Ellen Levy, Barry Levy and on behalf of REMAX Allegiance," by which RE/MAX would release all of Shenandoah's obligations under the November 2013, listing agreements. Another condition precedent was that the District of Columbia Department of Housing and Community Development ("DCDHCD") confirm in writing that the SRA is not subject to the Tenant Opportunity to Purchase Act ("TOPA"). The record contains an affidavit from Brian stating that "when [he] asked the Levys to sign such a release in January, 2014, they declined to do so."[6] The record also contains the March 5, 2015, Shenandoah Board of Directors resolution stating that the Levys and RE/MAX refused to sign a release and also that DCDHCD had not provided written confirmation regarding the non-applicability of TOPA.

It is axiomatic that "[a] third party seeking to recover on a contract must establish that a binding contract exists." *Amusement Indus. v. Stern*, No. 07 Civ. 11586, 2010 U.S. Dist. LEXIS 74822, at *31 (S.D.N.Y. July 26, 2010) (internal quotation marks omitted). If the SRA never became effective because of the failure of one or both of those conditions, it may be that the Silberbergs' breach-of-

---

[6] At the same time, Brian's deposition testimony refers to his statement at some point in time that "the Levys are happy to sign whatever documentation [Brian] needed."

contract claim would fail on the merits for lack of an enforceable agreement (unless perhaps, as the Silberbergs allege, the Beckers acted "to hinder [and] prevent performance of . . . the Agreement," in violation of their duty not to do anything that "will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract,"[7] or unless the court were to determine that the conditions precedent were not a material part of the Agreement[8]). Whether the SRA is enforceable is another issue to be sorted out on remand.

## IV.    The Breach of Fiduciary Duty Claims

A. The Rule 12 (b)(6) Dismissal

1.  Applicable law

---

[7] *Paul v. Howard Univ.*, 754 A.2d 297, 310 (D.C. 2000) (internal quotation marks omitted); *see also Minmar Builders, Inc. v. Beltway Excavators, Inc.*, 246 A.2d 784, 787 (D.C. 1968) ("It is a principle of fundamental justice that if a promisor is himself the cause of the failure of performance . . . he cannot take advantage of the failure." (internal quotation marks omitted)).

[8] *See* Restatement (Second) of Contracts § 229 (Am. Law Inst. 1981) ("To the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange.").

"[T]he holders of closely held stock in a corporation . . . bear a fiduciary duty to deal fairly, honestly, and openly with their fellow stockholders." *Helms v. Duckworth*, 249 F.2d 482, 487 (D.C. Cir. 1957). "Especially in closely held corporations, the majority shareholder owes a fiduciary duty to the minority shareholder (or shareholders) 'not to exercise [their] control to the disadvantage of minority stockholders.'" *Mona v. Mona Elec. Grp., Inc.*, 934 A.2d 450, 464 (Md. Ct. Spec. App. 2007) (quoting *Lerner v. Lerner Corp.*, 750 A.2d 709, 720 (Md. Ct. Spec. App. 2000)). "Indeed, the majority shareholder[s] of a close corporation owe[] to the minority shareholder[s] the heightened fiduciary duty typically applicable under partnership law." *McKowan Lowe & Co. v. Wain*, No. 92-4618, 1993 U.S. Dist. LEXIS 11010, at *30-31 (D.N.J. Aug. 2, 1993). Majority shareholders owe a fiduciary duty to minority shareholders not to use their voting power for their own benefit or for a purpose adverse to the interests of the corporation and its stockholders. *See Cooperative Milk Serv. v. Hepner*, 81 A.2d 219, 224 (Md. 1951).

### 2. Application of the law to the case

As described above, the trial court reasoned that the Silberbergs' breach-of-fiduciary-duty allegations were not specific enough to withstand dismissal under

Rule 12 (b)(6). The trial court also emphasized, for example, that "directors may receive compensation and officers may be salaried" and that there was nothing in the alleged actions by the Beckers that constituted poor business judgment or was outside the protection of the business judgment rule, which establishes a presumption that, in making a business decision, the directors of a company have acted "in good faith and in the honest belief that the[ir] action taken was in the best interests of the company." *Behradrezaee v. Dashtara*, 910 A.2d 349, 361 (D.C. 2006) (internal quotation marks omitted).

The Amended Complaint alleges that the Beckers individually or together, breached their fiduciary duty to the Silberbergs by calling a January 30, 2014, meeting to elect officers without notice as required by the company's by-laws and conducting the meeting without the attendance of any of the Silberbergs (thereby not dealing fairly and honestly with the minority shareholders), and then, with Brian claiming to be Shenandoah's President, signing contracts to sell the corporation's properties, thereby "hinder[ing], prevent[ing] performance [of,] and . . . abrogat[ing] the [SRA]"; in September 2014, paying a total of $189,000 in dividends only to the Beckers, and paying dividends to Rachel and Jason only two months later and to Howard not until 2015; and taking directors' and officers' compensation totaling $60,000 per year, "raid[ing] . . . the corporate cash" to do

so. We disagree that these allegations were not specific enough to withstand dismissal, because they are similar to allegations that have been found in other cases to support claims for breach of fiduciary duty.[9]

We also disagree with the trial court's reasoning that none of the allegations of the Amended Complaint could, if proven, overcome the protection of the business judgment rule. As we recognized in *Behradrezaee*, that presumption established by the business judgment rule can be overcome, for example, by allegations that the board or officers paid salaries to individuals "who performed

---

[9] For example, in *Jara v. Suprema Meats, Inc.*, 18 Cal. Rptr. 3d 187 (Ct. App. 2004), the court applied the rule that "payment of excessive salaries to working shareholders may be tantamount to a discriminatory payment of dividends." *Id.* at 201 (citing *De Martini v. Scavenger's Protective Ass'n*, 40 P.2d 317 (Cal. Dist. Ct. App. 1935)). Similarly, in *Banks v. Vito*, 562 A.2d 71 (Conn. App. Ct. 1989), the court observed that "[i]f the controlling majority stockholder seeks to injure the minority stockholder though the means of looting the corporation or so wrecking it that the minority stockholder would get nothing out of his assets, the claim resulting therefrom is sufficient to constitute an individual action." *Id.* at 74 (internal quotation marks omitted). And in *Crain v. Electronic Memories & Magnetics Corp.*, 123 Cal. Rptr. 419 (Ct. App. 1975), the majority shareholder of a computer company exercised its control over the company to have the company sell the entire business to a third party for cash and then to loan the cash back to the majority shareholder in return for an unsecured promissory note. *Id.* at 422, 423-24. The minority shareholders sued the majority shareholder, alleging that the transaction left the computer company "as a shell corporation with an unsecured note as its principal asset." *Jara*, 18 Cal. Rptr. 3d at 200 (summarizing the basis of the suit in *Crain*). The appellate court held that the complaint sufficiently alleged a breach of fiduciary duty that entitled the plaintiffs to individual relief against the majority shareholders. *Crain*, 123 Cal. Rptr. at 430.

services of little or no benefit to the corporation, thereby diverting profits" to those who decided to pay the salaries. 910 A.2d at 362, 364. The similar allegations of the Amended Complaint — that Joanne, Brian, and Robin took salaries totaling $60,000 even though "the sole business operation of Shenandoah was the maintenance and rent collection for the two properties for which a professional management firm had been and continued to operate the business . . . without any need for supervision by the corporate officers," thereby "remov[ing] as much cash as possible from the corporation" — were enough to preclude dismissal of Counts III-V, even though (as the trial court observed), as a general rule and under Shenandoah's by-laws, officer and director compensation is allowed.

The trial court also reasoned that the Silberbergs' claim that they have been "financially damaged" by the Becker majority's actions is "bare and conclusory." The Beckers assert that "the most obvious inadequacy in the Silberbergs' [breach of fiduciary duty] claims pertains to damages." However, while under some statutory schemes plaintiffs are required "to plead with particularity actual damages caused,"[10] under the *Twombly/Iqbal* standard applicable to most claims,

---

[10] *Logan v. LaSalle Bank Nat'l Ass'n*, 80 A.3d 1014, 1022 (D.C. 2013) (recognizing that under the Real Estate Settlement Procedures Act, damages claims must be pled with particularity).

"the lack of detail in the complaint is not a basis for dismissing a claim for damages at [an] early stage of the litigation[,] as plaintiffs are under no obligation to plead damages with particularity." *Democracy Partners v. Project Veritas Action Fund*, 285 F. Supp. 3d 109, 126 (D.D.C. 2018); *see also Alemayehu v. Abere*, 199 F. Supp. 3d 74, 86 (D.D.C. 2016) ("At this juncture, Mr. Alemayehu is not required to make a precise damages calculation."); *NCB Mgmt. Servs., Inc. v. FDIC*, 843 F. Supp. 2d 62, 70 (D.D.C. 2012) (holding that "[a]t [the pleadings] stage," a plaintiff "need not plead with particularity damages that would typically be expected to flow from its claims"). The Beckers are correct that a plaintiff must prove actual damages and proximate cause to recover on a breach-of-fiduciary-duty claim, *see Aronoff v. Lenkin Co.*, 618 A.2d 669, 687 (D.C. 1992), but it was error to dismiss the Silberbergs' claims at this stage of the litigation for failure to specify how precisely they were damaged by the alleged breach of duty.[11]

For the foregoing reasons, we conclude that the trial court erred in dismissing Counts III-V for failure to state a claim.

---

[11] Moreover, it seems "possible to calculate the amount of . . . disguised dividends" "paid . . . in the form of excessive compensation." *Jara*, 18 Cal. Rptr. 3d at 203.

B. The Dismissal of the Amended Complaint as Moot

The trial court ruled that "[e]ven if the Amended Complaint were not dismissed under Rule 12 (b)(6), it would be dismissed on mootness grounds." That is because, the court reasoned, to the extent the Silberbergs' Amended Complaint claimed that "the Becker[s] . . . acted without proper Board approval," all of the Beckers' challenged actions "w[ere] ratified at the 2015 annual meetings."

Ordinarily, if a transaction "was fair, just[,] and beneficial to the corporation" and there was full disclosure regarding the action to be ratified, it "may be ratified by a majority of the stockholders of the company." *Wiberg v. Gulf Coast Land & Dev. Co.*, 360 S.W.2d 563, 567 (Tex. Civ. App. 1962); *see also Putnam v. Juvenile Shoe Corp.*, 269 S.W. 593, 597, 599 (Mo. 1925) (en banc) (stating that "[i]t is entirely reasonable and just that the stockholders should have such power to ratify action of the directors, taken for the benefit of the corporation," but recognizing that if majority directors fraudulently voted themselves increased salaries, that action could not be ratified by a vote by a majority of shareholders consisting of those who received the preferential payments, so as to bind non-assenting stockholders). If, however, "the transaction

is detrimental to the corporation,"[12] the rule is less protective of directors: "[A]n alleged wrong committed by the directors against the corporation" is "beyond ratification by a [mere] majority of the stockholders." *Rogers v. American Can Co.*, 305 F.2d 297, 312 (3d Cir. 1962) (internal quotation marks omitted); *see also In re Safety*, 775 F.2d at 662 ("[N]o cause of action will lie if *all* of the shareholders have ratified the transaction." (emphasis added)); *Pittman v. American Metal Forming Corp.*, 649 A.2d 356, 361, 362 (Md. 1994) (endorsing the rule that "[e]ven when the transaction is detrimental to the corporation, no cause of action will lie if all of the shareholders have ratified the transaction" (internal quotation marks omitted)).[13]

In this case, the Amended Complaint alleges that the actions by Joanne and Brian and the Beckers that constituted breaches of fiduciary duty also "were and are not in Shenandoah's best interests." It alleges, for example, that the purchase

---

[12] *In re Safety Int'l, Inc.*, 775 F.2d 660, 662 (5th Cir. 1985).

[13] *Cf. Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 937 (Del. 2003) ("[W]here a cohesive group of stockholders with majority voting power was irrevocably committed to [a] transaction, effective representation of the financial interests of the minority shareholders imposed upon the [board] an affirmative responsibility to protect those minority shareholders' interests," something the board could not accomplish "by leaving it to the stockholders alone to approve or disapprove the [transaction]" if the cohesive group had "a majority of the voting power that made the outcome of the stockholder vote a foregone conclusion." (internal quotation marks and brackets omitted)).

and sale agreements signed by Brian were to facilitate a sale that "would create a corporate federal and District of Columbia tax [liability] of approximately $900,000" for Shenandoah (on a sale of each building for $999,000). A reasonable jury could find that a vote to rescind the SRA and to enter into the purchase and sale agreements was not taken in the best interest of the company. Further, a reasonable jury could find that the decision by the Becker-controlled Board to pay annual compensation totaling $60,000 to the Beckers serving as directors and officers of Shenandoah, despite the (alleged) fact that a professional management company was doing the work of the company and despite the company's limited cash, not only permitted the Beckers to "receive[] a disproportionate share of the corporation's cash," but also was not taken in the best interest of the company. In addition, the Amended Complaint alleges that Brian's withdrawal of all funds from Shenandoah's Sonabank account and deposit of those funds into his own account caused "outstanding payments which had been drawn on the account to pay taxes to be dishonored[,] resulting in penalties and interest against the corporation." That withdrawal of funds, too, could reasonably support a jury finding that, during the time period involved in this case, the Beckers did not always act in the best interest of Shenandoah.

If, as the Silberbergs allege, the complained-of actions were not fair to the corporation or were contrary to the corporation's best interests, a vote of *all* of the shareholders (not just the interested shareholders and directors) was required to ratify the actions that are the subjects of Counts III-V.  Accordingly, at this stage of the litigation, we cannot agree that the Beckers' votes to ratify those actions were effective so as to render the Silberbergs' breach of fiduciary duty claims moot.

**

For all the foregoing reasons, the judgment of the Superior Court dismissing Counts II through V of the Amended Complaint is

*Reversed and remanded*.